IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| vs. | * | Criminal No. 05-398 (JNE) |
| LARRY MCPHILLIPS | * | |

### AFFIDAVIT OF LARRY MCPHILLIPS IN SUPPORT OF POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS

I, LARRY MCPHILLIPS, am over 18 and competent to make this Affidavit. This Affidavit describes the series of events that occurred from 1998 through 2002 regarding the founding of my company, CCNow Incorporated, the later acquisition of CCNow by Innuity Inc., and its subsequent purchase by Digital River Inc.

### BACKGROUND - CCNOW

The CCNow concept was born during a conversation with a friend of mine in early 1998. She was making plans to start a small business on the Internet, selling gift items by mail order. She needed an inexpensive, easy-to-use Internet commerce solution that would allow her to sell items from an Internet web site and accept credit cards for payment, and she asked me for some recommendations.

After doing some research, I was surprised to discover that no one had yet created such a solution. All of the companies providing e-commerce services required either expensive start-up fees or a high percentage of each transaction, and most of their products required a good deal of technical knowledge to set up the shopping cart software.

Marcus & Bonsib
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

I checked several Internet discussion forums dedicated to e-commerce concerns. What I heard on those forums echoed my earlier research. I read postings from many hundreds of would-be Internet entrepreneurs, all asking the same question: How can I set up a small Web business without having to hire a computer programmer, and without having to pay several hundred dollars in start-up fees?

I founded CCNow in May of 1998 to answer this need. I carried out all of the software development and web site design myself, drawing on my 12 years of prior experience in financial systems design. CCNow took its first Internet order on July 22, 1998.

I chose the name "CCNow" in order to emphasize that merchants could begin accepting credit card payments now, rather than having to wait 3 to 4 weeks to get the merchant accounts and shopping-cart software set up.

It was clear from the outset that there was considerable pent-up demand for CCNow's services, because the company experienced phenomenal growth during its first years of existence. Key milestones in CCNow's early history were:

- July, 1999          Reached $500,000 per month in sales
- October, 1999       Reached $1,000,000 per month in sales
- July, 2000          Reached $2,000,000 per month in sales

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

## CORE CRITICAL PRINCIPLES

CCNow's initial growth was fast, but not easy. In order to maintain its business model, the company had to constantly struggle to earn the trust of three different constituencies: buyers, merchants, and credit card associations.

The task of satisfying all three groups was difficult. Because the company was blazing a trail in Internet commerce, we had to learn several lessons "the hard way" about how the company should be run. There were early struggles while learning how to prevent credit card fraud on non-U.S. transactions. We also had some initial problems securing a sufficient amount of Visa & MasterCard processing rights to sustain the business model and allow for future growth.

Each time a problem occurred in the early days of CCNow, I studied the details of the problem carefully and then made specific changes to our operations in order to prevent similar issues from occurring in the future. This practice of conscientious management served us incredibly well, and in many cases it was necessary for our very survival.

Eventually, from this process emerged a set of "Core Critical Principles" which governed the operation of CCNow. Without these principles, an Internet credit-card processor could not operate successfully.

Among the knowledge I gathered and incorporated into our Core Critical Principles was:

- It is extremely important to keep the rate of credit card "chargebacks" (customer inquiries due to fraud or disputes) below 1.5% of total sales volume. A chargeback rate higher than 1.5% catches the eye of risk-

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

3

management staff at merchant banks, and this makes it difficult to continue operating the business. After implementing and refining a first-rate fraud detection methodology, CCNow's chargeback rate stayed well below that threshold. We even achieved a rate as low as 0.3% in some billing periods.

- CCNow must ensure that its toll-free customer service number gets printed on each cardholder's monthly statement, right next to the charge amount. This encourages buyers who have forgotten what they purchased from CCNow to call us directly, rather than having to contact their credit card company. We expended much effort, including some rather strenuous technical programming and testing, to be sure that our toll-free number would appear on every type of card issuer's statement.

- When receiving a "retrieval request" from a credit card company (where the cardholder has forgotten what a purchase is for and is asking for a copy of the receipt), the request must be responded to very quickly. If retrieval requests are not answered in a timely manner, cardholders might initiate a chargeback, which in turn contributes to a higher chargeback ratio as described above.

- The customer service area, where representatives answer phone calls and e-mail inquiries, must be staffed liberally. Internet customers are generally more savvy than previous mail-order customers, and they expect instant gratification from Internet businesses. This makes it

4

even more important to respond quickly to customer inquiries in this business model. If a customer's questions about an Internet transaction are not answered quickly, that customer's patience will be exhausted more quickly, thus leading once again to a higher incidence of disputes and chargebacks.

- Merchant payments must be made exactly on schedule, and payment policies must be detailed precisely, in order for CCNow to build trust among its client base. This is particularly important because of the existence of several public Internet forums for online merchants. Any merchant that experiences problems with an online transaction processor such as CCNow will promptly report those problems on Internet discussion forums. A problem as serious as delayed payments would then have a cascading effect on the business's credibility, due to the rapid dissemination of that information on the Internet.

- The reliability of CCNow's technical infrastructure is also of paramount importance. We learned that if a shopping site experiences down time – even a relatively small amount of down time, such as 10 minutes – it causes clients to call into question the viability of the company and its reputation as a legitimate business. Early in CCNow's history, I decided to invest several thousand dollars in new hardware solely for the purpose of increasing the speed and reliability of our web site.

CCNow's adherence to these "Core Critical Principles" was the only reason

5

we were able to achieve the phenomenal growth that we enjoyed in our first two years. Our outstanding level of professionalism and the rock-solid reliability of our staff, our web site, and our payments, earned us high praise on various Internet forums, even compared with competitors.

CCNow gained more prominence when our company was mentioned in articles published by such organizations as The New York Times and CNN.

Several competing companies did attempt to launch services to compete with CCNow during our early years. We witnessed a number of other firms with names like Sypro, Magic Button, WeCharge, CardHost, and CCSlide come into existence. Interestingly, every single one of those businesses failed within just a few months. In reading the descriptions of those imploded businesses on Internet e-commerce forums, I confirmed my earlier suspicions: The firms had failed because they didn't have the "secret ingredient" that CCNow possessed, which is our list of core principles above.

In the small-business Internet community, the CCNow brand stood for integrity. This was a mark of pride for me personally. During 1999, CCNow's brand equity allowed us to grow to become the largest e-commerce processor of mail-order merchandise in the world.

## ACQUISITION INTEREST IN CCNOW

By the spring of 2000, CCNow was enjoying the rarified heights of success. We had 7 full-time employees, $2M in monthly sales, and we were making plans to expand into a new, larger office (our 3rd office space in two years).

CCNow began to look like an attractive acquisition target to many Internet

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

6

companies as a result of our outstanding sales expansion (100% growth in less than a year) and our growing network of 8,000 Internet merchants. And perhaps most importantly, the company boasted a unique quality that was almost unheard of among Internet ventures -- we were *profitable*. Thanks to sound fiscal management and strict adherence to credit card industry guidelines, CCNow was able to achieve positive cash flow almost from its inception.

As a result, we received overtures from several Internet infrastructure companies that wanted to acquire CCNow and add our product to their umbrella of services. I wasn't necessarily looking for the company to be acquired. But if a proposal came along, I was certainly willing to listen, particularly if the acquiring company had the necessary resources to create a good fit and produce opportunities for mutual expansion.

In order to create an "M&A Team" (merger / acquisition), I brought in two colleagues with the necessary experience. John Lynch, a technology sales specialist with experience in business negotiations, and Carl Paladino, a CPA whom I had worked with at New York Life, were my advisors during discussions with potential suitors.

We received several merger proposals over a period of time in 1999 and 2000, all of which were structured as stock-only deals with no cash. Two of the more notable early inquiries were from Homestead and Signio.

Homestead, a provider of web site design services, wanted to acquire CCNow in order to begin offering a "drag-and-drop" payment functionality to their suite of design tools. We met with Homestead's senior management and their venture capital

7

firm, and we listened carefully to their long-term plans. Homestead had some exceptionally innovative ideas, and plenty of venture funding to last for years. But the company did not have any revenue-generating products or services at the time, and we found that troubling. Furthermore, they did not plan to add any revenue to their business model in the foreseeable future. We informed them that we would respectfully pass on the offer.

Signio, a provider of e-commerce infrastructure, also expressed interest in acquiring CCNow in order to be able to offer a more well-rounded suite of e-commerce products and services. Compared with Homestead, Signio had the benefit of collecting actual revenue from its clients. However, while reviewing their software features and functionality, we were taken aback by the presence of several glitches and bugs in Signio's products. Also of concern was the company's business plan, which was incapable of producing near-term profitability. We decided to pass on Signio's offer as well.

## INNUITY INC. APPROACHES CCNOW

On May 4, 2000, we received an inquiry from Dean Sinatra, who worked in the business-development unit of Innuity Inc. which was based in Minneapolis. (The company no longer exists today.) Dean's inquiry was not regarding an acquisition; rather, he was merely interested in a partnership agreement between Innuity and CCNow that would allow us to offer a turnkey e-commerce solution to Innuity's existing client base.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

Innuity positioned itself to customers as a one-stop service bureau for small and medium-sized businesses that wanted a Web presence. Innuity offered a variety

8

of services to their clients, such as web site design, site promotion, graphics services, e-commerce services, and Web advertising packages.

After some initial discussions about the general structure of the partnership agreement, Dean Sinatra and I agreed to work further on the details of the plan. Dean then requested our cooperation in a due-diligence examination of our company by Innuity. This was a reasonable request, given the fact that CCNow was much smaller than Innuity (we had only 8 employees, compared with 700 employees at Innuity). After appropriate non-disclosure agreements were signed, we provided several items of documentation that Innuity requested. These included charts and figures showing sales volume, client base growth, and cash flow.

Shortly after we provided these items, I received word from Dean Sinatra that Innuity's senior management now shared his interest in CCNow, and also that they might want to talk about a full acquisition rather than just a partnership.

Dean and I then shifted our conversations into a different gear to discuss the possibilities of an acquisition. As before, I gathered my advisors John Lynch and Carl Paladino to get their recommendations along the way. After more phone calls between Innuity and CCNow, the three of us flew to Minneapolis for discussions in earnest.

At Innuity's headquarters, we met the company's CEO, John Dennis. John and his senior management gave a presentation that described Innuity's structure, its capabilities, its management philosophies, and its prospects for the future. We were quite pleased with what we heard. Unlike previous companies who had approached us with acquisition ideas, Innuity had multiple revenue streams from their various

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

9

product lines. More importantly, they also communicated an expectation to achieve profitability in about two years.

After the presentation, Innuity's management described the specific benefits that CCNow would derive by having access to the financial resources of a large company. They communicated a sales and marketing strategy for the CCNow product which included the following initiatives:

- Integrate the CCNow functionality into Innuity's existing product lines, so that Innuity's existing customers could immediately incorporate CCNow into their web sites.

- Using Innuity's telemarketing staff in a direct-sales approach, target small businesses that need a web site with e-commerce capabilities. Sell the CCNow product to those businesses in conjunction with Innuity's other products.

- Increase the advertising budget for the CCNow product, targeting Web-based businesses selling items through their own direct web sites or via auction sites.

- Outsource CCNow's fraud detection services as a stand-alone product. Market these services to merchants with high-risk transactions and merchants with a large portion of their customer base outside the U.S., where fraudulent orders are more problematic.

- Develop an online marketplace for CCNow merchants which can then be integrated into large shopping portals, such as Infospace and Yahoo Shopping.

- Implement a Buyer Rewards Promotion, where consumers receive points based on the purchases they make from CCNow merchants. Customers can

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

then redeem their points and receive free merchandise, discounts on

purchases, or other promotional offers from participating CCNow clients.

- Offer a Customer Wallet feature within CCNow, which allows customers to
register their payment and shipping information once, and then make repeated
purchases in the future without having to enter the information again. This
encourages repeat business from existing customers by making it more
convenient to shop at CCNow.

- Integrate business promotion services into the CCNow product offering, in
order to increase sales at merchant sites and thus drive CCNow revenue
higher. This includes search engine submission and optimization, advertising
and media services, discounted web hosting services, and premier placements
in CCNow's online marketplace.

All three of us were impressed by Innuity's presentation, and particularly by

the effort they had put into developing a sales and marketing strategy just for

CCNow. We decided to proceed further with the possible acquisition of CCNow by

Innuity. I asked John Lynch to look at Innuity's proposed figures for the all-stock

deal and prepare for negotiations, and I asked Carl Paladino to review Innuity's

financial statements. Both John and Carl were satisfied that the proposed deal was

sound, although Carl was generally wary of any all-stock deal. We decided to

proceed with negotiations.

### THE ANNUITY ACQUISTION

Our decision to pursue a merger with Innuity was based primarily on the

synergistic marketing opportunities that Innuity's management wanted to implement.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

In addition to the initiatives listed above, the management was also in discussions with large, well-known technology companies, such as Intuit and Infospace, to cross-market Innuity's products (including CCNow in the future) to those companies' customers.

With all of these opportunities at our doorstep, we had decided that an Innuity/ CCNow marriage was a great match. The next step was to agree on the specifics of a deal.

We noticed that Innuity's management employed some rather aggressive tactics at the first round of negotiations in Minneapolis. For example, some of the inducements they had originally proposed as part of the deal (such as a "trigger clause" which guaranteed that Innuity shares would have a certain minimum value) were abruptly taken off the table at the start of negotiations. The CCNow team adjusted to these changes by asking for an increased number of shares to compensate for the increased risk. The reaction we saw from Innuity's management was quite dramatic. They abruptly stood up and concluded the meeting, saying there was no deal to be had. They exited the conference room very suddenly and even turned out the lights, leaving myself and John and Carl sitting there perplexed. Then Dean Sinatra came back in the room and hurriedly rushed us out of the building - - not through the front door where we had come in, but via a back door that opened out to a garbage dumpster.

The reason we were so bewildered by this behavior was that Innuity had invested so many weeks in preparing for the CCNow acquisition talks. It seemed counterproductive for them to throw away all of that work simply because the

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

12

negotiations had hit a minor snag. There was just too much opportunity in this merger, for both CCNow and Innuity. That night at dinner, we wondered if the display of theatrics that we witnessed was just an elaborate negotiating tactic. And indeed it was. After the CCNow team had returned home, Innuity's management contacted me again to resume negotiations by phone. They attempted to continue the discussions without the presence of my lead negotiator, John Lynch, and I had to stand firm in requiring support from my team during the remaining negotiations.

After a few more rounds of talks, we finally hammered out a deal. I sold CCNow to Innuity in exchange for 375,000 shares of Innuity stock plus 73,750 Innuity stock options, and I also received an employment contract with specific benefits and guarantees, to continue running the CCNow operation for three years from the Maryland office. My employees also received certain guarantees that I had bargained for, including a continuation of the same compensation and leave benefits under Innuity that they had enjoyed at CCNow.

The deal was signed on September 6, 2000 and CCNow officially became a business unit of Innuity Inc. I was excited about implementing Innuity's sales and marketing initiatives for CCNow and watching the business grow even further. I told my employees to get ready to "take over the world".

Unfortunately, the bold, innovative vision that Innuity's management had communicated to me was not to be. After the acquisition was complete, I discovered with dismay that Innuity was a financially troubled organization that had been dying a slow death since early 1999. The company was completely unable to implement any of the CCNow marketing initiatives that they had proposed – on the contrary, they

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

13

were teetering on the verge of insolvency and lacked the funds to do anything of the sort.

Instead of launching CCNow into a new era of exponential growth, Innuity's management ushered in an era of catastrophe and upheaval (detailed in the next section) which centered on the need for quick cash. Senior management quickly decided to sacrifice CCNow's professional credibility with merchants and vendors in order to siphon off CCNow funds and resources to other parts of the organization, which ultimately caused CCNow merchant payments to be seriously delayed, sometimes for weeks. Innuity also re-staffed CCNow customer service with a *smaller* staff in Minneapolis, thus abandoning our long-held practice of providing timely replies to customer inquiries, and further causing ill effects which will be described in the next section.

Looking back, I'm amazed at the speed with which Innuity's management derailed the grand plans we had made together. As I wrote this narrative, I found myself asking a question: From the date I sold my company to Innuity, how long was it before they had fired all my employees, raided the merchant funds account, stopped paying CCNow merchants on time, violated Visa and MasterCard regulations, quadrupled the rate of credit card disputes, violated a key clause of my employment agreement, and left me personally at risk for thousands of dollars in debt to vendors and employees? How long did it take for them to do all that?

The answer: It took about five months.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

14

### EARLY DISCOVERIES: THE OTHER SIDE OF INNUITY

Shortly after the acquisition by Innuity was complete, several incidents occurred which caused me to have serious misgivings about the health of the company I had sold my business to and the quality of its management. Some of the earlier items in the chain of events are summarized in this section.

A few days after the acquisition was signed, I received a call from Dean Sinatra, who informed me that the CEO, John Dennis, had called him and was upset. He had just realized that a portion of CCNow's merchant funds ($500,000) were held in 6-month reserves at our merchant processing bank, which meant that those funds were not immediately accessible to us. John wanted an explanation. (The reserve funds were declared as such in the financial reports we had provided to Innuity, but John had not noticed it until now.)

I found this rather odd. It's unusual for the CEO of a large company to be so gravely concerned about cash flow to the point that a mere $500,000 is cause for alarm.

During the transition period, we were working on moving payroll functions to the corporate Human Resources office and I received a call from Deborah Eppert, the director of HR. She told me that Innuity would be reducing the compensation and leave benefits for CCNow employees after they transitioned to Innuity. Specifically, she said that Innuity would:

(a) Cut out the performance-based bonus that was part of the compensation package for three CCNow employees; and

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

15

(b) Disregard all vacation time that had been accrued by CCNow employees thus far.

This was despite the fact that I had specifically negotiated a provision in the Acquisition Agreement which stated that all employee benefits under CCNow would transfer to Innuity. I pointed out the applicable sections of the Agreement to Deborah, but she asked me to call Neil Ayotte (the company's General Counsel) to discuss it with him.

I failed to see any source of confusion on this point, because Innuity's HR Department had previously requested that we fax Ms. Eppert all employee compensation and benefit information (including accrued leave figures) before the acquisition was signed, and our business manager, Pat Tiger, did that.

Over the next several weeks, I placed several calls to Neil Ayotte to try and discuss the matter, and I also wrote him several times as well. Neil usually did not return my calls. Whenever I did manage to speak with him on the subject, he offered only vague responses such as "we'll have to look into that matter further". I continued to bring up the matter at every status meeting with the company's management, but the only responses I got were similar stonewalling.

As one can imagine, these announcements by Innuity had a disastrous effect on employee morale at CCNow. Not only had some employees received a salary cut after being told their salaries would stay the same, but employees also suffered the horrible experience of having weeks of saved vacation time abruptly taken away.

16

Almost overnight, the CCNow employees went from being proud, enthusiastic pioneers of Internet e-commerce who loved their jobs and their company, to feeling immense resentment toward their own employer.

On October 5, 2000 (a few weeks after the acquisition was signed), I received a call from Bill Rivard, the company Controller, who worked for the CFO. Bill instructed me to send $1.2 million from the CCNow account to the Innuity corporate account in Minneapolis. I complied.

Then on November 3rd, we were instructed to send an additional $300,000 to the corporate account. On November 22nd, the call was for another $250,000.

These were the first in a series of transfers that Innuity's management instructed me to make over the next several months. I was concerned about these transfers because they caused the CCNow merchant funds to be depleted beyond our gross profit from operations (in other words, CCNow would need that money back someday in order to pay its merchants). It didn't make sense that Innuity would need to borrow money from CCNow merchants if the company was financially sound.

My concern would grow even more critical later, as Innuity gradually drained the merchant funds to the point where CCNow could not meet its merchant payment obligations.

As agreed in the transition team meetings, Innuity's management appointed a web designer to create a new CCNow web site. The re-designed site was intended to reflect our new affiliation with Innuity, as well as

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

17

promote our upcoming suite of e-commerce services to online merchants.

I received an advance copy of the new web site for review, and I was completely aghast. Innuity's management had outsourced the task to an inexperienced freelance consultant who apparently had no command of the English language. Every single paragraph, and in fact almost every *sentence*, was comprised of the most juvenile phrasing, bad grammar, and unprofessional language one could imagine. The text of the web site looked, quite literally, as though it were written by a child.

The Marketing Department's instructions to me were almost comical: "Please review the new web site and let us know if you have any last-minute changes. We will go live with the new site later this week."

I could not possibly fathom how we could go live with such an appalling creation in just a few days' time. I called my corporate marketing contact and explained that this could not be fixed by mere "last-minute changes". He casually dismissed the issue, and instead focused on the need to quickly make Innuity's products and services known to CCNow's 20,000 registered clients.

I couldn't believe what I was hearing. After placing several more phone calls to higher-ups in Minneapolis and "jumping up and down" (to the extent possible over the phone), I was able to convince management that the new web site was completely unworkable. But in order to do that, I had to spend many hours explaining that a financial services web site such as CCNow needs to meet certain basic standards of professionalism.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

18

As I witnessed these early events, I began to suspect that Innuity's stated

motives for acquiring CCNow had been fabricated. Publicly, I held my tongue. But

the situation caused great consternation in me and among my employees. We had

taken great pride in building CCNow during the preceding three years and reaching

unprecedented heights of success. We had achieved this success by keeping

faithfully to the core principles that we knew were necessary to sustain the business

model. And right from the outset, it appeared that our new corporate owner was

ready to throw those principles away.

### CONTINUING PROBLEMS UNDER INNUITY

During the next several months after CCNow was acquired by Innuity, a

number of other incidents occurred which continued to erode my confidence in

Innuity's management and its business ethics.

Prior to the acquisition, Innuity's management had proposed several

marketing initiatives that would really kick CCNow's growth into high gear. Some of

these were listed earlier in this document.

Surprisingly, of all the initiatives that were put forth by Innuity's

management, none were implemented. After the CCNow acquisition was complete,

these initiatives dried up one-by-one as the company repeatedly refused to allocate

funding or staffing to implement them.

The internally-based product initiatives (such as integrating CCNow's

functionality into Innuity's existing product lines, and using Innuity's existing

telemarketing staff to sell CCNow's product to existing customers who need small-

business e-commerce services) should have been the easiest to implement. But even

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

19

the internal items were dead in the water. After the acquisition, Innuity's

management stated that they could not hire additional software developers to put

these initiatives into practice.

I wasn't quite sure what to make of this at first. I was puzzled, because it

didn't seem to make sense that Innuity would acquire CCNow if it had no intention of

implementing these ideas. If you don't put any of these synergistic opportunities into

practice, then all you've got are two disjoint companies chugging along

independently. The companies don't mutually contribute to each other's success, and

there is no business purpose for the merger.

There was a wide range of external marketing initiatives which were also

touted by Innuity's management during our pre-acquisition talks. CCNow was to be

integrated with web site builder services such as Trellix and Homestead, which would

provide customers of those companies with easy, one-click access to CCNow's

functionality. But after the acquisition, Innuity's management refused to allocate

enough software development resources (either in Minnesota or Maryland) to

complete these programs. Similarly, an initiative to list CCNow merchant products in

various Internet shopping engines, such as Yahoo Shopping and Buy.com, was

indefinitely delayed after the acquisition because no staff was available to work on

those projects.

As Innuity took control of the operation of CCNow, their motivation for

acquiring my company became abundantly clear. It became apparent that their intent

never was to aggressively build the sales volume and take advantage of key business

partnerships with other Internet sites. The real reason they wanted CCNow was

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

20

because they had no money to pay their bills, and CCNow had a bunch of cash sitting in the bank. Gradually this became even clearer as the months passed. I witnessed Innuity's management repeatedly ignoring the list of business growth opportunities they had identified, while simultaneously draining the funds out of the CCNow merchant funds account in a last-ditch effort to stave off financial insolvency.

After the acquisition, I visited the corporate office in Minneapolis several times for various meetings. One day while meeting with Bill Rivard, the Controller in the finance department, I got a glimpse of the day-to-day management of the company's money, and I had an opportunity to see some first-hand examples of the dire financial situation that Innuity was in.

Bill Rivard's daily life at Innuity was marked by one financial catastrophe after another. As I sat in his office, he described to me some of the problems he was facing. He showed me an Excel spreadsheet that listed all of the vendors for whom payment was due. I felt a deep sense of foreboding as I looked and saw that some vendors were owed very large amounts of money, and in most cases the payments were several months overdue. Bill said the Finance department routinely refused to return phone calls from vendors who were calling to discuss the payment of their bills. He told me that some of the vendors with long-overdue balances had become so agitated that they finally flew to Minneapolis, walked in to the corporate headquarters and demanded to see someone. And even then, management refused to meet with them! This state of affairs was a shock to me, and it was of grave concern.

While I was sitting in Bill's office, he also took a call from Edward Hechter, who worked in the Product Development department at one of the satellite offices

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

21

(either Seattle or Los Angeles; I cannot remember which). Edward mentioned to Bill that the rent payments on the satellite office were way past due, and that the landlord hadn't been able to reach anyone at the corporate office to inquire about payment. So the landlord had started asking Edward about the past-due rent, simply because Edward happened to be a senior Innuity employee who worked in that office. On the phone, Edward told Bill that he was trying to negotiate with the landlord to avoid getting kicked out of their office. This was very strange because Edward had nothing to do with paying bills or negotiating with landlords; he was in charge of product development. But even though Edward had no idea when the rent would be paid, it fell to him to talk to the landlord because no one in the finance department would return the landlord's calls.

While meeting with Bill Rivard, I also learned that CCNow was the only business unit of Innuity that was profitable. Bill jokingly griped about CCNow being the only unit that was giving him a possible tax liability, because CCNow was the only source of positive cash flow in the whole organization.

My opinion about the manner in which Innuity managed its financial affairs was markedly affected by my time in Bill Rivard's office. I was quite surprised to learn that Innuity's finances were an utter mess. When you don't even return phone calls from vendors to whom you owe lots of money, the situation is out of control.

Perhaps most importantly, it became more obvious to me that Innuity had some serious financial problems that were not disclosed prior to the acquisition of CCNow, and that the presentation given by Innuity's senior management failed to indicate that the company was in that precarious financial situation. I want to point

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

22

out again that I had brought two advisors with me to observe Innuity's presentation and assist in the decisions regarding the acquisition. Both John Lynch and Carl Paladino were present at the pre-acquisition meeting in Minneapolis, and they saw the same presentation that I did. After the meeting, both of them indicated to me that they thought the merger was a good match, and neither of them got the impression from the presentation that the company was in financial trouble.

Also, it's worth recalling that we didn't just jump at the opportunity to be acquired. We had rejected two prior suitors who were interested in acquiring CCNow, as described earlier. When evaluating prospective offers, we placed much emphasis on the financial health and long-term prospects of the companies we spoke with. We were very careful in our evaluation of these factors, which led us to reject those prior suitors and to accept Innuity's proposal.

At this point I had questions that were difficult to answer. If Innuity was allegedly healthy when we signed the deal in September 2000, how could the company possibly be doing so poorly just a few months later? Why did they need the CCNow funds so urgently, to the point where they eventually started delaying some CCNow merchant payments and causing other payments to bounce?

It appeared that the whole company was being propped up by CCNow, as CCNow was the only source of positive cash flow according to Bill Rivard. Further, it appeared that the primary reason that Innuity had wanted to acquire CCNow was simply because we had millions of dollars in the bank and Innuity was strapped for cash.

Prior to the acquisition, I had provided Innuity's management with a list of

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

23

tasks (at their request) that needed to be completed in order to assure CCNow's

continued stability and reliability.  One of the tasks was of particular importance, and

I designated it as high-priority in the planning meetings following the acquisition:

We needed to perform an expert security analysis of our systems and servers.  In light

of the ongoing problems that many Internet companies had experienced with hackers

and intruders, we needed to analyze where the vulnerabilities were in our system and

make improvements as necessary.

Even though I continued to specify that the security review was a high-priority

task in all subsequent status meetings with Innuity's management, the security review

was not done.

Then in January 2001, the CCNow servers were penetrated by a computer

hacker in Russia.  The hacker gained access to thousands of credit card numbers, and

the incident caused a great deal of upheaval and negative publicity for CCNow and

Innuity.

Immediately after the hacking incident occurred, Innuity's management was

still slow to respond.  Rather than address the problem immediately, the management

staff dragged their feet deciding what to do.  This delay meant that the CCNow web

site was completely shut down for an unprecedented four days before the problem

was finally fixed.  The reaction to the four-day outage on the part of CCNow's client

base was profound.  Our clients were incensed that we would shut down their online

business for that long.  Many of them found another payment service to use and never

came back.  Large clients (who produced lots of revenue for CCNow) were

particularly angry because many of them depended on CCNow for the very survival

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

24

of their online businesses.

This incident was particularly stinging because it was entirely preventable. Innuity's management knew that CCNow needed a system security review and that the reliability of CCNow's technical infrastructure is one of the core critical business requirements, as discussed earlier. Yet they did not allocate the resources to perform that review. Even after the hacking incident occurred, management's further dawdling caused CCNow's reputation to be additionally damaged in the aftermath.

Innuity's cash management problems eventually began to have a direct effect on CCNow client payments. As noted earlier, Innuity began moving large amounts of money out of the CCNow client funds account shortly after the acquisition was complete in September 2000, and continued that practice on a regular basis.

By mid-2001, the client funds account had been so depleted of cash that it didn't contain enough funds to cover outstanding checks. Innuity was basically "kiting" checks every time it ran our twice-monthly check run.

Innuity's management then began to do something that I would have considered unthinkable: they stopped sending client payments on time. On one occasion, for example, I received word from Bill Rivard in the corporate office that he had delayed mailing a large batch of cashier's checks for several weeks. Another example was an incident where an entire batch of direct-deposit payments bounced, because there was not enough money in the client funds account to cover those payments.

This behavior violates another one of the core critical business requirements of CCNow. As described earlier, failure to make client payments on time will utterly

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

25

demolish public trust in CCNow. The existence of several Internet forums for online merchants meant that word will spread rapidly about serious problems such as delayed payments.

There is another danger in delaying client payments as well. If a payment processor fails to make payments on time, clients will begin complaining to the Visa and MasterCard credit card associations. If Visa/MasterCard receives enough complaints about not distributing funds on time, the V/MC member bank will shut down the processing of CCNow's transactions (effectively shutting down the entire business). This would mean that CCNow would have no more revenue coming in, because credit-card revenue was our only source of business.

To compound the problem, when a Visa/MasterCard merchant bank decides to shut down processing, they take any money that was in the pipeline on its way to the merchant (typically 3 days' worth), and they hold those funds, plus the cash reserves that we had to deposit when the merchant account was opened, for a period of 6 months following the shut-down date. So under that scenario, CCNow would owe money to our clients for items they shipped, but not have enough money to pay them all, and there would be no money coming in to the company either. It would be a total business disaster; it would destroy the business and the brand name; and it would leave thousands of merchants having shipped merchandise but not getting paid for it.

Innuity continued the practice of draining money from the CCNow client funds account during the entire time of Innuity's ownership of CCNow. By the time CCNow was sold to Digital River in March of 2002, Innuity had drained a total of 5

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

26

million dollars from the client funds account, leaving it almost empty. Digital River had to agree to replace the $5 million themselves as part of their CCNow acquisition deal.

In January 2001, I called Mary Dedrick, Innuity's Vice President of Operations, to discuss the progress of an office move for the CCNow staff in Maryland. A new, larger office had been leased prior to the Innuity acquisition, but we had not yet moved in pending the installation of our high-speed Internet connection.

To my surprise, Mary instructed me to halt the planned move to the larger office. She said that Innuity was considering staff reductions in several areas of the company, and that the CCNow staff in Maryland might be laid off. Mary said that the functions of the CCNow staff might be performed by the general customer-service staff at the corporate office in Minneapolis.

I was flabbergasted. I called Neil Ayotte (Innuity's corporate counsel), this time inquiring about another section of the acquisition agreement. My three-year employment agreement prohibited Innuity from taking "any action that results in a substantial reduction of Employee's responsibilities or materially changes the nature or extent of Employee's duties," and it states that if the company does take such an action, I can resign my position (with 30 days notice) and still receive full salary and benefits for the three-year term. It didn't seem to make good business sense for Innuity to consider such a move, and I wanted to head off such a decision if possible.

I told Neil what I had heard, and I expressed my concern that a layoff of the CCNow staff might very well constitute a "substantial reduction of responsibilities,"

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

27

and that I'd like to avoid that if at all possible. Neil was non-committal in his response, as was the case with my previous inquiries regarding Innuity's disregarding its obligations per the acquisition agreement. He said he wasn't quite sure how that clause might be interpreted, but that they were definitely interested in keeping me on board and that he didn't think my own job was at risk.

I followed up the conversation with a letter to Neil. But 7 days later, I received notice from the corporate office that my entire staff was being laid off, and that the Maryland office would be closed.

After enduring the many frustrations of working with Innuity's management, the CCNow staff layoffs led me to the breaking point. I decided that if I were to continue working for a company so deeply hobbled by inept and unethical management, it would test my sanity. I decided to resign my position. I wrote a letter to the CEO, John Dennis, and informed him that I would resign effective February 16, 2001 (the end of the 30-day notice period). (See Exhibit No. 8 to Sentencing Memorandum) I agreed to be available on an hourly consulting basis after that date in order to help with the transition of critical skills. Innuity and I later agreed on a consulting rate of $85.00 per hour.

After my full-time employment ended, Innuity did stop paying my salary as though it were a regular termination. During the first few weeks, I did not think about it much because I didn't know whether I wanted to pursue that issue or not, and because I was still making some income consulting for Innuity.

Following the dismissal of the CCNow staff in Maryland, Innuity began to sacrifice more of the critical principles of CCNow's operation. The replacement staff

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

28

in Minneapolis was smaller than the Maryland staff, and they could not keep up with the volume of customer service phone calls and e-mail messages. Response times for these inquiries grew longer and longer, and eventually it took several days for a CCNow customer to receive a response to a billing question.

This is a crucial issue in the operation of an Internet firm such as CCNow. As described earlier, if a customer calls CCNow to ask about an item on their credit card bill and the call is not returned quickly, the customer will call his/her credit card company to dispute the charge. As mentioned above, the rate of these "chargeback" disputes must be kept below a certain threshold in order for the company to remain in good standing with the Visa/MasterCard card associations. And in fact, failure to answer customer billing inquiries promptly is a direct violation of Visa and MasterCard regulations.

In addition to delaying responses to CCNow customers, Innuity also began to delay responding to "retrieval request" forms from credit card companies. As described earlier, these requests occur when a cardholder has forgotten what a purchase is for and is asking for a copy of the receipt. If retrieval requests are not answered in a timely manner, cardholders initiate chargeback disputes for that reason as well.

CCNow's larger clients began to notice a sudden increase in the number of cardholder disputes, and it was a harrowing experience. When a chargeback dispute is received, CCNow's client policy calls for an immediate deduction of that dollar amount from the corresponding client's account. The client has therefore shipped merchandise for which he/she will not be paid. To encounter even a single

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

chargeback dispute can be traumatic for a client. But to suddenly receive a massive swelling of disputes for no apparent reason (each one representing a financial loss to the client) causes no end of frustration among our larger clients.

As a result of this lack of attention to customer communications on the part of Innuity's management, the chargeback ratio began to increase, thus jeopardizing CCNow's business model.

Following my resignation from Innuity, a series of potential financial liabilities began to surface. These were cause for some concern, because it was possible that I would be held personally liable for these items.

> o  I received letters from the landlord of our new office (the one
>     we had leased but never moved into). Innuity had stopped
>     paying the rent on that office space, and it was several
>     months past due. The landlord was demanding payment of
>     the remaining rent due, which was approximately $45,000.
>
> o  The local phone company (Verizon) also began sending me
>     letters and making phone calls demanding payment of past-
>     due phone bills, which totaled $5500.
>
> o  At least two CCNow clients, frustrated by Innuity's increased
>     chargeback disputes, late client payments, and lack of
>     responsiveness following the layoff of the CCNow staff in
>     Maryland, threatened to sue me personally for selling the
>     company to Innuity. The implication was that I had failed to
>     exercise due diligence in investigating Innuity's financial

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

30

health prior to approving the merger. It's worth noting that those clients are just the ones I happened to hear from before my office was closed down. If there were other clients who were as outraged as the two I was able to speak with, the possibility of a class-action suit would have pushed my personal liability much higher.

I was worried about the past-due bills, and I spoke with Neil Ayotte about the collections calls I was receiving. I asked him if Innuity could pay the landlord bill and the phone bill because I was receiving calls several times a month threatening legal action. Neil's response was that if they sued me, he didn't think they would end up winning the case. He also said that if they sued me and won, Innuity would "kick in to help you out". I wasn't quite sure whether to believe that, so I asked him again if we could just pay the bills now, and he said he didn't think Innuity could do that.

In August of 2001, I was contacted by David Goldfarb and Bill Parodi, founders of another Internet commerce business originally named ATSBank. Prior to the CCNow acquisition, David and Bill had sold their company to Innuity in a similar all-stock deal. Innuity renamed the business MerchanTrust, and David Goldfarb had been employed by Innuity since then as a senior director. In the ensuing months, David and Bill had also become disillusioned with Innuity's management and its business practices.

David and Bill told me that when they first heard Innuity was considering acquiring CCNow, they had asked the management staff for my contact information.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

They wanted to call and give me some background information about Innuity's management and the company's history, from the point of view of a former business owner.

When they asked for my contact information, they were emphatically instructed not to call me. They said to me, "We asked for your phone number, and they told us not to call."

This discovery contributed to the impression that Innuity's management might have deliberately concealed unfavorable information about the company during the pre-acquisition presentations and discussions. What didn't they want me to find out prior to my agreeing to sell my company to them? David Goldfarb and Bill Parodi had qualified information about the way Innuity does business, particularly from the point of view of a small-business owner contemplating a merger with Innuity, and the management wanted to conceal that information from me.

### PURSUING SALARY DUE WITH INNUITY

As noted above, Innuity's decision to lay off all of my employees and close my office in Maryland caused the remainder of my salary under the three-year employment agreement to be payable under the terms of that agreement. The total remaining salary to be paid was $387,500.

By March of 2001, there were several factors which led me to pursue with Innuity the payment of that salary.

A major event in my life occurred in March of 2001 when my girlfriend at the time, Joanne Harris, informed me that she had become pregnant. This was a surprise to both of us, because Joanne was using Depo-Provera, an injectable contraceptive

Marcus & Bonsib
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

32

that lasts for three months, and she kept up-to-date with it at her doctor's office.

Joanne expressed a desire to raise the child, and I told her that I would gladly provide financial support as well. Joanne had three other children from a previous marriage, and I had become close friends with her children and her entire family. Although we did not want to get married, we agreed that the situation was manageable if I provided financial support and continued to spend time with her children.

I viewed the impending birth of my son, Tyler, to be a major responsibility and a major calling in my life. I wanted to do everything possible to shore up my personal finances so I could "step up to the plate" of fatherhood.

After converting from an Innuity employee to a part-time consultant, I planned to find a new full-time job elsewhere. But shortly after beginning the consulting work at Innuity, it became apparent that I wouldn't be able to work a regular job while also doing the Innuity transition and training work. I was still "critical staff" because no one had yet been trained to do all of the day-to-day operations tasks for CCNow. That meant I was still needed at all hours of the day, night, and weekends; and at times my weekly work schedule was almost full-time anyway.

I did conduct a series of detailed training sessions in the Minneapolis office, and several employees in Minneapolis were then proficient at handling the day-to-day operations of CCNow. But shortly after I conducted those training sessions, Innuity announced another round of staff cuts, and most of the people who had attended the training sessions were themselves laid off. I had to once again resume the critical

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

33

day-to-day functions myself until staff could be re-allocated and another training

session could be scheduled. (There were a total of four rounds of layoffs at Innuity

during 2001 and 2002.)

I could have pursued full-time employment elsewhere, if I were to completely

abandon Innuity and leave the CCNow product crippled beyond repair. But I

couldn't quite bring myself to make a decision that drastic. I was still a major

shareholder in Innuity, and I did not want to do something that would probably have

killed the organization instantly.

Another option might have been to give up on Innuity and start another

e-commerce service similar to CCNow, since I knew how to do that well. But the

acquisition agreements with Innuity contained key non-compete clauses which

wouldn't expire until a year later. That option wasn't available to me unless I was

willing to risk some nastiness between myself and my fellow shareholders at Innuity.

In order to strike the best balance between helping to keep Innuity afloat and

being able to provide for Tyler in the manner he deserved, I decided to pursue with

Innuity the matter of the remaining salary that was due.

Beginning in March of 2001 (the month after I had resigned my full-time

position), I made periodic phone calls to Deborah Eppert, the VP of Human

Resources, and Neil Ayotte, Innuity's corporate counsel, to ask about resuming

payment of the three-year salary that was contractually owed to me. I do not recall

the specifics of each phone call, as there were several such calls over a four-month

period, but I recall pressing Neil Ayotte for details as to why the salary should not be

paid and he seemed unwilling to engage in such a discussion. I also told Neil that I

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

34

had even started to consider filing a lawsuit to collect the salary. He said that he couldn't discuss that with me, but he reminded me that there were already several collection lawsuits pending against Innuity and that I would have to decide whether such an action would be worth the time, money, and energy. The implication, which we both knew to be true, was that Innuity was unlikely to ever have the cash needed to satisfy all of its outstanding obligations.

After a few months of these discussions with Neil Ayotte, he stopped returning my calls altogether.

### INCREASED PERSONAL PROBLEMS

My son Tyler was born on July 26, 2001. I had become increasingly anxious about the peculiar financial situation I was in. In addition to the responsibility of providing for a new baby, there was the matter of Innuity's unpaid bills for which I might be personally liable, plus the financial exposure from potential lawsuits by angry clients and angry employees. I hadn't been able to take another full-time job because of the flexibility and unpredictability of the Innuity work I was doing, and there was a double-edged decision I was faced with: either find a new full-time job, thus killing Innuity's only cash-producing division and risk losing the potential value of my Innuity shares; or stay with Innuity in the hopes of rescuing the value of the organization while risking a severe personal cash crunch.

As the baby's birth approached, I felt an even greater urgency to collect the salary that Innuity owed me in order to secure my financial stability in the short term.

I was already in charge of paying most of the CCNow-related expenses, including client payments which were issued twice per month, as well as non-client

payments such as rent, utilities, accounting services, office supplies, and other miscellaneous vendors. Even after converting to a part-time consulting role, the decisions about most of these payments still fell to me, and my signature was still on every CCNow check that was mailed out, totaling thousands of checks per month. Since my salary was a CCNow-related expense, it was conceivable that I might make decisions about whether to pay it, based on the internal business practices at the time.

In addition to their failure to pay the salary that was owed to me, Innuity had also stopped paying my consulting bills after a few months as well. I was still a critical employee for Innuity's CCNow operations, and yet by mid-2001 I was receiving absolutely no income for my work at Innuity.

During a phone conversation I had in August 2001 with Bill Rivard, the company Controller, he made a remark which confirmed in my mind the legitimacy of me paying myself the money that was owed to me. I had just completed a transfer of funds from one of the CCNow accounts in Maryland to the corporate account in Minneapolis, and I called Bill to let him know the transfer was done. Bill said to me, "Oh, you could've just taken that money for your consulting fees and deducted it from what we owe you."

At the time, Bill may not have been aware of the size of the debt that was owed to me, but in my mind this conversation allowed me to further rationalize my conduct.

Another major factor I used as continued justification for my conduct was my growing realization of the deception that was carried out by Innuity's management about the company's financial health and its true motivation for acquiring CCNow.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

36

Their deception caused me to sell my company to an organization that I otherwise would have had no desire to be affiliated with. CCNow was a prospering, world-class e-commerce provider with a sterling reputation prior to Innuity's raiding of the company funds and resources. The deception on the part of Innuity's management was the direct cause of the financial quandary I now found myself in. Innuity's refusal to honor the key agreements we had made as part of the acquisition deal was particularly injurious.

From the beginning and throughout the course of my conduct, I made these payments to myself using a set of CCNow client accounts that I had created. Before each CCNow check run, I credited relatively small dollar amounts to these client accounts, causing the payments to be made to myself on a twice-monthly basis.

With respect to the salary issue, since the total amount now owed was fairly large, and because Innuity was not obligated to pay it as a single lump payment, I decided to gradually increase, over a period of months, the amount that I was sending to myself.

### ADDITIONAL INFORMATION: TYLER HARRIS

Although circumstances in the Harris family have changed since Tyler was born, I still maintain the same closeness and friendship with that family today.

Tyler's mother, Joanne, developed a drug problem in 2002 and lost custody of her children. I still visit the children once or twice a week for various activities (they live with Joanne's mother now), and I am still friends with Joanne as well.

When Tyler was 3 years old, I attempted to add him as a beneficiary to my Social Security death benefit, since that had been overlooked when he was born. The

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

37

Social Security Administration required a paternity test in order to take this action,

because of the time that had elapsed since his birth. The results of the paternity test in

2004 indicated that Tyler was not actually my biological son. We were all quite

surprised by that revelation. But it turns out not to have affected the close

relationship I have with that family. After loving Tyler as a son for 3 years, I find

that the relationship is still a natural part of my life, and I'm still glad to be a part of

Tyler's and his brothers' lives.

### SERIES C: DEVALUATION OF INNUITY SHARES

Innuity's cash crisis continued to grow more serious in 2001. By the summer,

Innuity's management decided to raise more money by issuing a new series of shares,

a debt instrument which was known as Series C.

The management decided to reduce all existing shares in Innuity to only 10%

of the company. The remaining 90% of the company would be owned by new Series

C shareholders, who would loan the company money in exchange for these Series C

shares.

This was bad news and good news for Innuity's shareholders, such as myself.

On the one hand, this represented a massive devaluation of the shares belonging to all

existing shareholders. My existing shares in Innuity were now almost worthless,

because my shares were part of the Series which was "squashed down" to 10% of the

company. On the other hand, Innuity's management had generated enough interest in

the new Series C debt instrument to gather additional working capital from some of

its key investors. That meant the company might have a chance at surviving long

enough to sell off its various business divisions and thus generate some return on

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

investment for the Series C shareholders.

I decided to participate in the Series C offering by using the debt that was owed to me for consulting services. This seemed to make sense, since the chances of my otherwise actually being paid for my consulting services seemed uncertain. In essence, I converted vendor debt to Series C debt, which had a higher debt prioritization and also paid 8% interest.

As of October 11, 2001, I had converted a total of $25,000 in consulting debt to Series C debt.

On December 18, 2001, Innuity held a shareholder conference call in order to appeal for more participation in Series C, because two important deals were in the works. Plans were being made to sell the CCNow e-commerce unit to Digital River and sell the QuikPage web design unit to WebSitePros. Innuity still needed money to run its operations for a few more weeks in order to get to completion on those two deals and they sweetened the original Series C offer by adding the additional inducement that any new Series C participant after December 18 would also receive a consulting credit equivalent to the dollar amount of new Series C participation. This essentially had the effect of doubling the amount that Innuity owed for each new Series C dollar that was loaned. I decided to convert another $10,000 of consulting debt into new Series C debt, and then loan another $50,000 in cash, bringing my total participation in Series C to $85,000.

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

## SERIES C VIABILITY IN QUESTION

By March of 2002, the WebSitePros deal had been completed and the Digital River deal was nearing completion. However, during a Series C shareholder conference call, we received word that Innuity may not be able to return all of the capital that was owed to us. The company had sustained larger-than-predicted losses from the collapse of one of its billing providers (losses in the range of $3 - $4 million instead of $1 million) and had also been forced to pay some large vendor bills in order to avoid a shutdown of critical services. As a result of these items, the future viability of the Series C debt was questionable.

I was particularly dismayed by this news, because all signs had pointed to an upturn in Innuity's prospects. Instead of a relatively quick return on our debt, the Series C shareholders would now have to wait for quite some time (possibly years) to find out whether any of Innuity's successor organizations could eventually raise the money to repay the Series C debt. As of today, that possibility appears extremely remote.

As of April 2002, the picture of Innuity's debt to me looked like this:

| | |
|---|---|
| Salary due for the remainder of the three-year employment agreement | $387,500 |
| Consulting debt, later converted to Series C debt | $35,500 |
| New debt under Series C offering | $50,000 |
| Series C consulting credit for participation after 12/18/2001 | $60,000 |
| Series C interest | $4,800 |
| Total | $537,300 |

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

40

At this point, I allowed my despair over these figures to severely impair my judgment. I continued my actions, even after the Digital River acquisition of CCNow, and that was completely improper. I deluded myself into thinking that because Digital River was assuming responsibility for CCNow liabilities that it would be all right to continue with Digital River. That was a complete fallacy. I'm pretty sure I knew that Innuity didn't transfer any non-client-related expenses to Digital River, but at the time I didn't face up to the reality of the situation.

I had also been experiencing anxiety over the increasingly threatening letters I was receiving regarding the past-due rent to the office landlord. (See Exhibit No. 11) They now had a law firm involved, and the total bill including attorney's fees had increased to $64,992. This too clouded my judgment, imparting a vague sense of panic which also contributed to my improper actions at that time.

## DIGITAL RIVER

Digital River officially acquired CCNow from Innuity on March 23, 2002. The purchase price was $5.7 million, according to an Innuity conference call on March 19. As noted earlier, at the time it was my understanding that Digital River needed to use at least $5 million of that purchase price to replenish the CCNow client funds account which had been depleted by Innuity.

After the acquisition, I was contacted by Mary Kay Bowman, the Innuity manager in charge of CCNow who was being transferred to Digital River. She asked if I could continue to perform the few remaining CCNow operations tasks that had not yet been transferred to other staff, perhaps for a few more weeks. I told her that would be fine, and I suggested the same consulting rate that we had used under

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

Innuity, which was $85.00 per hour. Mary Kay said she would check with the
necessary people at Digital River to set up a consulting agreement.

I didn't hear back from anyone at Digital River regarding the consulting
agreement, but I did continue consulting for Digital River (without pay) through June
11, 2002. Although I was not paid for those consulting hours, I didn't pursue the
matter since it would have been a relatively small bill compared to the outstanding
debts from Innuity.

During a Series C shareholder conference call on June 23, 2003 we learned
that Digital River had sent a letter to Innuity informing them of monetary damages
incurred due to a computer hacking incident in 2002 (presumably referring to my
improper collection of money from Digital River, although no names were
mentioned). The letter stated that as a result of this incident, Digital River would
withhold from Innuity a $200,000 payment which had been escrowed for the
purchase of CCNow.

Based upon this conference call, I believe that Digital River may have
recovered the funds from Innuity that I improperly collected and may not be due any
restitution. However, if there are any such funds or portion thereof which were not
recovered by Digital River, I acknowledge that I owe such monies to Digital River.

## EXHIBITS ATTACHED HERETO AND TO "POSITION
## OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS"

Exhibits No. 2 through 11 are true and accurate copies of the
Acquisition Agreement between CCNow and Innuity, my Employment Agreement
with Innuity, my 375,000 Share Certificate reflecting part of my interest in Innuity
pursuant to the Acquisition Agreement, emails that I sent during my business

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000

42

relationship with Innuity, Series C Offering documents, correspondence between

myself and Innuity, between Pat Tiger and Innuity and from the law firm seeking

payment on the CCNow Lease.

    I HEREBY SOLEMNLY SWEAR AND AFFIRM THAT THE
FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE,
INFORMATION AND BELIEF.

LARRY MCPHILLIPS       3-20-2006

                                    DATE

MARCUS & BONSIB
6411 IVY LANE
SUITE 116
GREENBELT, MD 20770
(301) 441-3000