# EXHIBIT NO. 3

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into as of this 1st day of August, 2000, by and among, **CCNow, Inc.,** a corporation organized under the laws of the State of Delaware ("Seller"), **Larry McPhillips,** an individual residing in the State of Maryland and the controlling stockholder of Seller (the "Principal"), **Innuity Acquisition Corp.,** a corporation organized under the laws of the State of Delaware (the "Buyer") and **Innuity, Inc.,** a corporation organized under the laws of the State of Minnesota (the "Parent").

### INTRODUCTION

A.      Seller is engaged in the business of processing credit card transactions conducted over the Internet (the "Business").

B.      Buyer is a wholly-owned subsidiary of Parent.

C.      Seller desires to transfer to Buyer, and Buyer desires to acquire from Seller, substantially all of the assets of Seller solely in exchange for voting stock of Parent and the assumption of certain liabilities of Seller in a transaction qualifying as a "reorganization" under Section 368(a)(1)(C) of the Internal Revenue Code of 1986, as amended, it being contemplated that Seller will, as an integral part of the transaction hereby contemplated, distribute for the benefit of its stockholders the voting stock of Parent received hereunder, and any remaining assets of Seller, in complete liquidation of Seller, and that Seller will thereupon be dissolved.

### AGREEMENT

NOW, THEREFORE, in consideration of the above recitals, which are hereby made a part of this Agreement, and the following mutual promises, it is hereby agreed as follows:

1.      Warranties, Representations and Covenants of Seller and Principal.  To induce the making of the transaction hereinafter provided for, Seller and Principal jointly and severally represent and warrant as follows with respect to Seller, subject to any exceptions set forth in the Disclosure Schedules attached hereto (hereinafter the "Schedule").

1.1      Corporation.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with the corporate power to own or lease its respective properties and to carry on the Business as now being conducted.  Except as set forth on **Schedule 1.1,** Seller does not own any capital stock in any corporation, is not a partner in any partnership and is not a member of any limited liability company.  **Schedule 1.1** sets forth the jurisdictions in which Seller is qualified to do business, and except as set forth therein, Seller is not required to qualify to do business in any other foreign jurisdiction.

1.2      Ownership.  There are a total of 1,500 shares of the capital stock of Seller issued and outstanding, of which Principal owns 1,125 shares, and John J. Lynch, III ("Lynch") owns 375 shares.

1.3   <u>Authority Relative to this Agreement</u>. The execution, delivery and performance of this Agreement by the Seller and Principal, including without limitation the sale, conveyance, transfer and delivery contemplated hereby:

(a)   Has been duly and effectively authorized by the Board of Directors of Seller with respect to the Business and the Assets (as defined in **Article 3** below) sold by Seller hereunder;

(b)   Has been authorized and approved by all of the stockholders of Seller; and

(c)   Does not and will not violate any provision of any order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, or conflict with, or result in a breach of, or constitute a default under the Articles of Incorporation or By-Laws of Seller, or any material agreement or instrument to which Seller or Principal is a party or by which either of them is bound. Furthermore, this Agreement constitutes a valid and binding obligation of the Principal enforceable against the Principal in accordance with its terms.

1.4   <u>Noncontravention</u>. The execution, delivery and performance of this Agreement and the consummation by Seller and Principal of the transactions contemplated hereby do not conflict with or result in any breach of any other provisions of, constitute a default under, result in a violation of, result in the creation of a right of termination or acceleration or any lien, security interest, charge or encumbrance on any assets of Seller, or require any authorization, consent, approval, exemption or other action by or notice to any court or other governmental body, under the provisions of Seller's articles of incorporation or bylaws, or any indenture, mortgage, lease, loan agreement or other agreement or instrument by which the Seller or Principal are bound or affected, or any law, statute, rule, regulation or order, judgment or decree to which Seller or Principal are subject.

1.5   <u>Governmental Authorities; Consents</u>. Neither Seller nor Principal is required to submit any notice, report or other filing with any governmental authority in connection with the execution or delivery by them of this Agreement or the consummation of the transactions contemplated hereby. No consent, approval or authorization of any governmental or regulatory authority or any other party or person is required to be obtained by Seller or Principal in connection with their execution, delivery and performance of this Agreement or the transactions contemplated hereby.

1.6   <u>Financial Statements; Absence of Undisclosed Liabilities</u>. Seller has provided Buyer with its "<u>Financial Statements</u>," which consist of (a) unaudited balance sheets, and related statements of profit and loss and stockholders' equity, as of and for the year ended December 31, 1999, of CCNow as conducted as a sole proprietorship owned solely by Principal prior to January 1, 2000 ("<u>Seller's Predecessor</u>"), and (b) the unaudited balance sheet and statements of profit and loss and stockholders' equity of Seller for the seven months ended July 31, 2000. Copies of the Financial Statements are attached hereto as **Exhibit 1.6**. The Financial Statements are based upon the information contained in the books and records of Seller and Seller's Predecessor and fairly present the financial condition of Seller or Seller's Predecessor, as applicable, as of the dates of the respective Financial Statements and results of operations, stockholders' equity and cash flows for the periods referenced therein. The Financial Statements have been prepared in accordance with generally accepted accounting principles

("GAAP") applied on a consistent basis throughout the periods covered thereby, except that they may not contain all notes which are required to be prepared in accordance with GAAP and they may be subject to year end adjustments (which will not be material, individually or in the aggregate). Except as reflected in the Financial Statements and as set forth on **Schedule 1.6**, Seller has no liabilities or obligations of any nature, whether secured or unsecured, accrued, absolute, contingent or otherwise, whether due or to become due, that would, individually or in the aggregate, materially and adversely affect the Business or the Seller.

1.7     No Material Adverse Changes.  Since June 30, 2000, there has not been, and the Seller and Principal have no reason to believe that from the date hereof through the Closing Date there will be, any material adverse change in the assets, financial condition, operating results, customer, employee or supplier relations, business condition or prospects of Seller.

1.8     Title to Assets and Absence of Encumbrances.  Seller owns and has good and marketable title to all Assets (as hereinafter defined) being sold by it hereunder, such Assets to be free and clear of any liens and encumbrances of every kind and nature, except as set forth on **Schedule 1.8**.  The delivery to Buyer of the instruments of transfer of ownership contemplated by this Agreement will vest good and marketable title to the Assets being sold hereunder in Buyer, free and clear of any liens and encumbrances of every kind and nature.  The Assets to be acquired by Buyer hereunder include all assets necessary for the operation of the Business as it has been operated by Seller.

1.9     Real Property Leases.

(a)     Seller owns no real property.  Seller has provided complete and accurate copies of all agreements to which it is a party for the lease or rental of any real property (collectively, the "Leases"), all of which are described on **Schedule 1.9**.  With respect to each of the Leases: (i) Seller has a valid leasehold interest; (ii) the Lease is valid, binding and enforceable in accordance with its terms and there is no default or any event which with notice or lapse of time or both would constitute a default thereunder; (iii) to the best knowledge of Seller and Principal, the buildings and structures located on the real property that is subject to the Leases are in good operating condition and repair (ordinary wear and tear excepted) and are suitable for their present uses and, in the case of each building or other structure (including without limitation the roofs thereof), are structurally sound; and (iv) to the best knowledge of Seller and the Principal, there are no other matters affecting any of such properties subject to the Lease, including, without limitation, pending or threatened which might reasonably be expected to have a material adverse effect on the condition of the assets, properties or Business of Seller or materially interfere with any present use of such property.

(b)     Seller is not, in any material respect, in violation of any applicable laws regulating the uses that may be made of the premises leased pursuant to the Lease or other law, regulation or requirement relating to the operation of such leased premises, and Seller and Principal have not received any written notice of any such violation, or the existence of any condemnation proceeding with respect to the premises subject to the Lease.

(c)     Seller and Principal have no knowledge of any improvements made or contemplated to be made by any public or private authority, the costs of which are to be assessed as

special taxes or charges under the Lease, and to Seller and Principal's knowledge, there are no present assessments payable by Seller as lessee under the Lease.

1.10    Tangible Personal Property. Set forth on **Schedule 1.10** is (i) a description of each item of tangible personal property ("Personal Property") (other than inventory) owned by Seller, (ii) a description of each item of tangible personal property not owned by Seller, but in the possession of or used in the Business of Seller, and (iii) a description of any leases relating to the use of each such item of tangible personal property not owned by Seller. Except as indicated in **Schedule 1.10**:

(a)    Seller has good and marketable title to each item of Personal Property described in clause (i) of this **Schedule 1.10**, free and clear of all liens, leases, encumbrances, claims under bailment and storage agreements, equities, conditional sales contracts, security interests, charges and restrictions;

(b)    As to each item of such tangible personal property now leased by Seller pursuant to any Purchased Lease, as defined in **Section 3(l)** below, the present condition of each item complies with the requirements of the applicable agreement between Seller and the owner or lessor thereof;

(c)    Each item of tangible personal property listed in **Schedule 1.10** is in satisfactory operating condition and repair and is fit for Seller's current intended purposes, ordinary wear and tear excepted; and

(d)    Seller owns or otherwise has the right to use all of the tangible personal property now used by it in the operation of its Business.

1.11    Intellectual Property. There is listed in **Schedule 1.11** (the "Intellectual Property") (i) a description of the items of intellectual property owned by, or used in the Business of Seller other than off-the-shelf "shrink-wrapped' software, including but not limited to, trade names, trademarks, trade name and trademark registrations, copyright registrations and applications for any of the foregoing and (ii) a true and complete list of all licenses or similar agreements or arrangements to which Seller is a party either as licensee or licensor for each such item of intellectual property.

(a)    Seller is the owner of all right, title and interest in and to each such item of Intellectual Property, free and clear of all liens, security interests, charges, encumbrances, equities and other adverse claims; and

(b)    Seller has the right and authority to use such items of Intellectual Property in connection with the conduct of its Business in the manner presently conducted, and Seller has not received notice that such use conflicts with, infringes upon or violates any rights of any other person, firm or corporation.

1.12    Accounts Payable. **Schedule 1.12** sets forth a complete and accurate listing of all of Seller's current accounts payable as of the day prior to the Closing Date (the "Payables"). Unless otherwise indicated on **Schedule 1.12**, all of the Payables are properly reflected on Seller's books and records, arose from bona fide transactions in the ordinary course of Seller's Business and are due and owing by Seller.

93517.9

-4-

1.13    Conduct of Business. Since June 30, 2000, except as disclosed on **Schedule 1.13**, there
has not been:

(a)    Any change in the condition (financial or other), properties, assets or liabilities
of the Business being sold or transferred hereunder, except changes in the ordinary course of business,
none of which has had or will have a material adverse effect on the Business;

(b)    Any business interruption, damage, loss or other occurrence having a material
adverse effect on the Business or the real estate subject to the Lease or other assets herein provided to be
sold or transferred, whether or not covered by insurance, as a result of any accident, fire, casualty, act of
God or the public enemy, or any labor dispute or disturbance;

(c)    Any other occurrence, event or condition, other than any occurrence, event or
condition affecting the industry generally and not Buyer in particular, which, to the best knowledge of
Seller and Principal, materially adversely affects the property subject to the Leases or the Assets (as
defined in **Article 3** below) being sold or transferred to Buyer hereunder.

1.14    Business Records. Seller has provided Buyer and its agents with access to all of the
business records of Seller, including specifically but not exclusively information relating to purchase
orders, customer invoice copies, correspondence with customers, accounts receivable and sales records
showing details concerning purchases and payments by customers, payroll records, personnel records,
and records of purchases from, accounts payable and payments to significant suppliers.

1.15    Business Organization. Seller has used its best efforts to preserve the Business intact; to
keep available to Buyer the services of the present employees of Seller, to the extent that Buyer may
desire to retain such services; and to do nothing to undermine the goodwill of those employees and the
suppliers, customers and others having business relations with Seller.

1.16    Tax Matters.

(a)    For purposes of this Agreement, the term "Taxes" means all taxes, charges, fees,
levies or other assessments, including, without limitation, all net income, gross income, gross receipts,
sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, social
security, unemployment, excise, estimated, severance, stamp, occupation, personal property, real property
or other taxes, customs duties, fees, assessments or charges of any kind whatsoever, including, without
limitation, all interest and penalties thereon and additions to tax or additional amounts imposed by any
taxing authority, domestic or foreign, upon Seller.

(b)    There are no liens for Taxes upon any assets of Seller.

(c)    Seller has filed by the applicable due date (including extensions thereof) all
returns or documents with respect to Taxes which are required to be filed, and such returns are correct.
Seller is not delinquent with respect to payment of any Taxes.

(d)     Except as set forth on **Schedule 1.16(d)**, no deficiency for any Taxes has been proposed, asserted or assessed against Seller that has not been resolved and paid in full or settled without any amounts due or owing.  Except as set forth on the **Schedule 1.16(d)**, there has been no tax audit or other administrative proceeding or court proceeding with regard to any Taxes nor is any such tax audit or other proceeding pending or threatened with regard to any Taxes.  Except as set forth on **Schedule 1.16(d)**, Seller does not expect the assessment of any additional Taxes of Seller and is not aware of any unresolved questions, claims or disputes concerning the liability for Taxes of Seller.

1.17    Contracts.  "Contract" means any and all sales orders, sales contracts, purchase orders, purchase contracts, distributor agreements, broker agreements, executory contracts, employment agreements, labor agreements, franchises, understandings, arrangements, leases, loans, instruments of indebtedness or other instruments or undertakings currently in effect to which the Seller is a party or to which any of Seller's property is subject or bound, whether oral or written.  **Schedule 1.17** is a complete list of all Contracts of Seller, with respect to which Seller has made available to Buyer a correct and complete copy.  With respect to each Contract:  (a) the agreement is legal, valid, binding, enforceable and in full force and effect; (b) neither Seller nor, to the best knowledge of Seller and Principal, any other party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (c) no party has repudiated any provision of the agreement.

1.18    Accounts Receivable.  "Accounts Receivable" means all accounts, instruments, drafts, acceptances and other forms of receivables relating to the Seller's Business, and all rights earned under Seller's contracts to sell goods or render services.  Unless otherwise indicated on **Schedule 1.18**, all of the Accounts Receivable are properly reflected on the Seller's books and records, arose from bona fide transactions in the ordinary course of the Seller's Business, are current and, to the knowledge of Seller or the Principal, collectible and will be collected in accordance with their terms at their recorded amounts.  None of such Accounts Receivable is or will be at the Closing Date subject to any counterclaim or set-off.

1.19    Employment Plans.

(a)     **Schedule 1.19** lists and generally describes:

(i)     all employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") that cover employees of the Business and that are sponsored by Seller or to which Seller is obligated to contribute ("ERISA Plans"); and

(ii)    all other plans providing compensation (other than salaries or wages), benefits or perquisites to any class of employees of the Business, including without limitation any incentive, bonus, stock option, restricted stock, vacation pay, sick pay and severance plans ("Compensation Plans"); and any "cafeteria plan" ("125 Plan") governed by Section 125 of the Internal Revenue Code of 1986, as amended (the "Code").

(b)     None of the ERISA Plans is a Multi-employer Plan, as defined in ERISA Section

4001(a)(3), or is a defined benefit pension plan subject to Title IV of ERISA. Seller is not delinquent in any obligation to make contributions to any ERISA Plan subject to Code Section 412 or Title IV of ERISA and has not terminated or withdrawn from participation in any such ERISA Plan.

(c)     Seller has furnished to Buyer true and correct copies of the ERISA Plans and any related trust agreements or other funding vehicles; true and correct copies of the 125 Plan and the Compensation Plans (or summaries of any unwritten Compensation Plans) and true and correct copies of any employment policy manuals distributed to any class of employees of the Business. With respect to each of the ERISA Plans and any 125 Plan, the Seller also furnished to Buyer the most recent summary plan description and annual report required to be made on Form 5500.

(d)     Seller has timely complied with all of its obligations under ERISA Section 602, Code Section 4980B and applicable state insurance laws, with respect to health and life insurance benefit continuation coverage to be provided by those of its ERISA Plans and any 125 Plan that provide such benefits; and Seller warrants that it will continue, after the closing date of the transactions contemplated by this Agreement, to comply with such obligations with respect to any of its employees or their beneficiaries who are or become entitled to such continuation coverage, and who do not accept employment with Buyer as of that date or the following business day.

(e)     No ERISA Plan maintained, sponsored or contributed to by Seller or any affiliate thereof within the meaning of Section 414(b) or (c) of the Code ("Affiliate") has been amended so as to give rise to a lien under Section 412 or 401(a)(29) of the Code.

1.20    Employees. **Schedule 1.20** hereto lists all employees of Seller as of the date hereof, in the case of each such employee sets forth the position, level of compensation, earned and accrued vacation, date of employment, and years of employment recognized for determining eligibility for participation in, and vesting and credited service under any ERISA Plans, Compensation Plans, or 125 Plan.

1.21    No Litigation. Except as set forth on **Schedule 1.21**, there are no claims, disputes, actions, proceedings or investigations of any nature pending (or threatened) against or involving Seller, the Principal, any of the Assets to be sold hereunder, or, to the best knowledge of Seller and Principal, any of Seller's officers, directors, agents or employees of Seller, at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, agency or instrumentality. Seller is not operating under or subject to, or in default with respect to, any order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency, or instrumentality.

1.22    Code § 1445 Affidavit. Seller is not a "foreign person" as defined in the Code, and the rules and regulations promulgated thereunder.

1.23    Compliance with Laws. Seller has not violated or failed to comply in any material respects with any statute, law, ordinance or regulation of any government or department or agency thereof in the conduct of the Business which could have a material adverse effect on the Business or the financial

93517.9                                    -7-

condition of Seller. Seller has not received notice of violation of any applicable zoning regulation, ordinance or other law, order, regulation or requirement relating to the Business.

1.24    Cash and Cash Equivalents. **Schedule 1.24** sets forth a true and accurate listing of all cash and cash equivalents held by Seller as of the day prior to the Closing Date ("Cash") and a description of the bank or other financial institution accounts where such Cash is held.

2A.    Warranties and Representations of Buyer . To induce the making of the transaction hereinafter provided for, Buyer represents and warrants as follows:

2A.1    Corporation. Buyer is a corporation, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to carry on its business as now conducted and as proposed to be conducted. Buyer is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

2A.2    Authority Relative to this Agreement. The execution, delivery and performance of this Agreement by Buyer, including without limitation the sale, conveyance, transfer and delivery contemplated hereby:

(a)    Have been duly and effectively authorized by the Board of Directors of Buyer; and

(b)    Does not and will not violate any provision of any order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, or conflict with, or result in a breach of, or constitute a default under the Articles of Incorporation or Bylaws of Buyer, or any material agreement or instrument to which Buyer is a party or by which any of them is bound.

2A.3    Noncontravention. The execution, delivery and performance of this Agreement and the consummation by Buyer of the transactions contemplated hereby do not conflict with or result in any breach of any other provisions of, constitute a default under, result in a violation of, result in the creation of a right of termination or acceleration or any lien, security interest, charge or encumbrance on any assets of Buyer, or require any authorization, consent, approval, exemption or other action by or notice to any court or other governmental body, under the provisions of Buyer's articles of incorporation or bylaws, or any indenture, mortgage, lease, loan agreement or other agreement or instrument by which Buyer is bound or affected, or any law, statute, rule, regulation or order, judgment or decree to which Buyer is subject.

2A.4    Governmental Authorities; Consents. Buyer is not required to submit any notice, report or other filing with any governmental authority in connection with the execution or delivery by it of this Agreement or the consummation of the transactions contemplated hereby. No consent, approval or authorization of any governmental or regulatory authority or any other party or person is required to be obtained by Buyer in connection with their execution, delivery and performance of this Agreement or the transactions contemplated hereby.

93517.9

-8-

2A.5   <u>Valid and Binding Obligation</u>. This Agreement constitutes a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

2B.   <u>Warranties and Representations of Parent</u> .  To induce the making of the transaction hereinafter provided for, Parent represents and warrants as follows:

2B.1   <u>Corporation</u>. Parent is a corporation, validly existing and in good standing under the laws of the State of Minnesota and has all requisite power and authority to carry on its business as now conducted and as proposed to be conducted.  Parent is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

2B.2   <u>Authority Relative to this Agreement</u>. The execution, delivery and performance of this Agreement by Parent, including without limitation the sale, conveyance, transfer and delivery contemplated hereby:

(a)   Have been duly and effectively authorized by the Board of Directors of Parent; and

(b)   Does not and will not violate any provision of any order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, or conflict with, or result in a breach of, or constitute a default under the Articles of Incorporation or Bylaws of Parent, or any material agreement or instrument to which Parent is a party or by which any of them is bound.

2B.3   <u>Noncontravention</u>. The execution, delivery and performance of this Agreement and the consummation by Parent of the transactions contemplated hereby do not conflict with or result in any breach of any other provisions of, constitute a default under, result in a violation of, result in the creation of a right of termination or acceleration or any lien, security interest, charge or encumbrance on any assets of Parent, or require any authorization, consent, approval, exemption or other action by or notice to any court or other governmental body, under the provisions of Parent's articles of incorporation or bylaws, or any indenture, mortgage, lease, loan agreement or other agreement or instrument by which Parent is bound or affected, or any law, statute, rule, regulation or order, judgment or decree to which Parent is subject.

2B.4   <u>Governmental Authorities; Consents</u>. Parent is not required to submit any notice, report or other filing with any governmental authority in connection with the execution or delivery by it of this Agreement or the consummation of the transactions contemplated hereby.  No consent, approval or authorization of any governmental or regulatory authority or any other party or person is required to be obtained by Parent in connection with their execution, delivery and performance of this Agreement or the transactions contemplated hereby.

2B.5   <u>Valid and Binding Obligation</u>. This Agreement constitutes a valid and binding obligation of Parent enforceable against Parent in accordance with its terms.

2B.6   <u>Valid Issuance of Common Stock</u>.  Subject to the other terms hereof, the Shares (as hereinafter defined) that are being issued hereunder, when issued, transferred and delivered in accordance with the terms of this Agreement, will be duly and validly issued, fully paid and non-assessable.

2B.7   <u>Capitalization of Parent</u>.

(a)   Parent is authorized to issue 100,000,000 shares of capital stock.  **Schedule 2B.7** includes a complete and accurate list of Parent's outstanding securities as of the date hereof (including all outstanding shares of Series A Convertible Preferred Stock, Series A Prime Stock, Common Stock, warrants, options and all other securities convertible into or exchangeable for shares of Parent's capital stock).

(b)   The outstanding shares of common stock of Parent are duly and validly authorized and issued, fully paid and non-assessable.

(c)   Other than the conversion privileges relating to Parent's outstanding shares of Series A Convertible Preferred Stock, Series A Prime Stock, and currently outstanding options and warrants, as set forth in **Schedule 2B.7**, there are not outstanding options, warrants, rights or agreements for the purchase or acquisition from Parent of any shares of its capital stock.  **Schedule 2B.7** sets forth: (a) the authorized capital stock of Parent, including the type of shares authorized, the par value per share and the number of each type of shares; (b) an accurate and complete list of the names of all stockholders of Parent and the numbers and types of shares owned of record by each such stockholder; (c) all outstanding subscription, option, call, warrant, convertible debenture or other right (whether or not currently exercisable) to acquire any shares of the capital stock or other securities of Parent; and (d) all contracts under which Parent is or may become obligated to sell or otherwise issue any shares of its capital stock or any other securities.

2B.8   <u>Parent's Financial Statements; Absence of Undisclosed Liabilities</u>. Parent has provided Seller with its "<u>Financial Statements</u>," which consist of (a) unaudited balance sheets and related statements of profit and loss and stockholders' equity as of and for the year ended December 31, 1999, and (b) the unaudited balance sheet and statements of profit and loss and stockholders' equity of Buyer for the months ended July, 2000.  Copies of the Parent's Financial Statements are attached hereto as **Exhibit 2B.8**. Parent's Financial Statements are based upon the information contained in the books and records of Parent and fairly present the financial condition of Parent as of the dates of the respective Financial Statements and results of operations, stockholders' equity and cash flows for the periods referenced therein. Parent's Financial Statements have been prepared in accordance with generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis throughout the periods covered thereby, except that they may not contain all notes which are required to be prepared in accordance with GAAP and they may be subject to year end adjustments (which will not be material, individually or in the aggregate). Except as reflected in Parent's Financial Statements and as set forth on **Schedule 2B.8**, Parent has no liabilities or obligations of any nature, whether secured or unsecured, accrued, absolute, contingent or otherwise, whether due or to become due, that would, individually or in the aggregate, materially and adversely affect the Business being acquired hereunder or the Parent. All debts, liabilities and obligations incurred after July 31, 2000, have been incurred in the ordinary course of business, and

93517.9

-10-

do not and will not individually or in the aggregate have a material adverse effect upon the business or financial condition of Parent.

2B.9   <u>No Material Adverse Changes</u>.  Since July 31, 2000, there has not been, and Parent has no reason to believe that from the date hereof through the Closing Date there will be, any material adverse change in the assets, financial condition, operating results, customer, employee or supplier relations, business condition or prospects of Parent.

3.   <u>Purchase and Sale of Business and Certain Assets</u>.

3.1   Subject to and upon the terms and conditions hereinafter set forth, and except with respect to each item or category of assets set forth in **Schedule 3.2** (the "<u>Excluded Assets</u>"), Seller hereby agrees to sell, transfer, convey and assign to Buyer, all right, title or interest it may have in, and Buyer agrees to purchase from Seller, the following described assets (collectively, the "<u>Assets</u>"):

(a)   All of Seller's inventories of merchandise and supplies held for sale, wherever located, (collectively the "<u>Inventory</u>"), a complete list of which is set forth on **Schedule 3.1(a)**;

(b)   The Leases and all leasehold improvements affixed to the real estate subject to any of the Leases that are not considered part of such real estate, fixtures, signs, furniture, equipment, vehicles, tools, supplies and computer equipment and related software wherever located;

(c)   All prepaid items and all other similar items of Seller, other than with respect to amounts representing prepaid insurance, a complete list of which is set forth on **Schedule 3.1(c)**;

(d)   All Contracts;

(e)   All Personal Property;

(f)   All Accounts Receivable;

(g)   All of Seller's cash (including amounts in bank accounts), certificates of deposit and other cash equivalents disclosed on the Financial Statements;

(h)   All of the Business as a going concern and its goodwill, including specifically the use of the name "CCNow, Inc." and any variations thereof;

(i)   All rights and interests in the Intellectual Property;

(j)   All business records, personnel data, information regarding customers (active, inactive and prospective), correspondence with suppliers and customers, all lists of suppliers, all accounts receivable and payable records and all other records, documents and other information (both written and machine-readable) in Seller's possession as may be reasonably necessary to enable Buyer to see to the efficient and proper conduct and administration of the Business and assets herein being sold;

93517.9

-11-

(k)     All Seller's rights necessary for the purpose of preserving and continuing existing arrangements (whether exclusive or otherwise) with the suppliers of Inventory (and any services essential to Seller's provision of services to its customers) and all rights under and pursuant to contracts with such suppliers, for the purchase of Inventory not yet delivered and services not yet performed;

(l)     All contracts and all rights of Seller thereunder under all leases of personal property and maintenance and service agreements relating thereto and all purchase options thereunder (the "Purchased Leases"), a complete list of which is set forth on **Schedule 3.1(l)**; and

(m)     All of the other assets, property, rights and claims owned by Seller on the Closing Date.

3.2     Excluded Assets. Notwithstanding anything to the contrary contained herein, Seller shall retain that amount (and only that amount) of its Cash or Accounts Receivable necessary to satisfy the Payables (the "Excluded Assets"). **Schedule 3.2** describes in detail the Cash and Accounts Receivable (if any) that comprise the Excluded Assets.

4.     Consideration Payable to Seller. Subject to the other provisions contained herein and as consideration for the purchase of the Assets, on the Closing Date, Parent shall deliver to Principal Three Hundred Seventy-five Thousand (375,000), and to Lynch One Hundred Twenty-five Thousand (125,000), shares of common stock of the Buyer, par value $.01 (the "Shares"). The parties recognize and agree that these Shares will be deemed to be issued to Seller in consideration of the Assets transferred hereunder, and immediately transferred by Seller to Principal and Lynch is conjunction with the liquidation of Seller, which will commence promptly after Closing.

5.     Assumption of Liabilities. Except with respect to the Leases and any executory obligations of Seller relating to any of the Contracts, neither Buyer nor Parent is assuming any obligation or liability, contingent, known or otherwise of Seller or Principal in connection with the transactions contemplated hereby.

6.     Employees

6.1     Employment of Seller's Employees. Buyer shall be permitted by Seller to review Seller's personnel and pay records on or before the Closing Date and interview any employee of Seller it elects to interview prior to the Closing Date and after disclosure of the transactions contemplated herein to Seller's employees. Buyer will employ the Principal pursuant to the terms of the Employment Agreement (in substantially the form of **Exhibit 6.1** attached hereto) to be executed simultaneous with the Closing. Buyer will offer to employ all of Seller's other employees on terms (including compensation, fringe benefit or retirement plan) substantially similar to the terms on which such employees are currently employed by Seller.

6.2     Employee Options. With respect to those employees of Seller who become employees of Buyer following the Closing, Parent shall grant to such employees options to purchase up to an aggregate of 73,750 shares of Parent's common stock, par value $.01, at an exercise price of $6.00 per share (the "Options"). The Option Agreement for each such optionee will be in substantially the form

93517.9
-12-

attached as **Exhibit 6.2**. The Options shall vest in three (3) equal installments on each of the three (3) anniversary dates following the Closing Date.

7.    Warrant Issuance.  Parent shall issue to Lynch a warrant to purchase 11,250 shares of Parent's common stock exercisable at $6.00 per share.  The form of such warrant will be in substantially the form attached hereto as **Exhibit 7**.

8    Closing Conditions.  The closing of the transaction herein provided shall be subject to the conditions precedent set forth below:

8.1    Conditions to Buyer's and Parent's Obligations.  All obligations of Buyer and Parent under this Agreement are subject to fulfillment or satisfaction, on or prior to the Closing Date, of each of the following conditions:

(a)    Seller shall have furnished Buyer with all documentation deemed reasonably necessary by and reasonably acceptable to Buyer's counsel, reflecting that all Assets herein provided to be sold to Buyer are free and clear of any and all liens, claims and encumbrances.  Such documentation shall also include (without limitation) (i) reports of searches of government records for security interests filed under the Uniform Commercial Code, tax liens and judgments affecting any of the property of Seller being sold hereunder, and (ii) evidence showing that Seller is not delinquent in the filing of returns or payment of any taxes (including without limitation sales, use, payroll, income and franchise taxes) due and payable on or before the Closing Date.

(b)    The lessor with which Seller has entered into the Lease shall have either (i) terminated such Lease with Seller, and Buyer shall have negotiated and executed a new lease with such lessor covering the real property subject to such Lease, and such new lease shall be satisfactory to Buyer in its sole discretion, or (ii) provided its approval and consent to Seller's assignment of the respective Lease to Buyer.

(c)    The written consents of any third parties necessary to consummate the transaction contemplated by this Agreement shall have been obtained and delivered to Buyer.

(d)    No claim, action, suit or proceeding shall be pending or threatened against Seller, Principal, the property subject to the Leases, Buyer or which, if adversely determined, would prevent or hinder the consummation of the transaction and other actions contemplated hereby or result in the payment of substantial damages as a result of such transaction and action.

(e)    The representations and warranties set forth in **Article 1** hereof shall be true and correct in all material respects at and as of the Closing Date as though then made, except that any such representation or warranty made as of a specified date (other than the date hereof) shall only need to have been true on and as of such date.  Seller and Principal shall have performed in all material respects all of the covenants and agreements required to be performed and complied with by it under this Agreement prior to the Closing.  Seller and Principal shall have delivered a certificate to Buyer to such effect.

(f)     All actions, proceedings, instruments and documents required to carry out this Agreement or incidental thereto and all other related legal matters shall have been approved by Maslon Edelman Borman & Brand, LLP, as counsel for Buyer and Parent.

The foregoing conditions are to be solely for the benefit of and protection of Buyer, and any one or more of them may be waived by Buyer in whole or in part at Buyer's option.

8.2     Conditions to Seller's and Principal's Obligations. All obligations of the Seller and Principal under this Agreement are subject to the fulfillment or satisfaction, on or prior to the Closing Date, of each of the following conditions:

(a)     Parent shall have delivered the Shares and the Warrant, and taken the other actions required by Section 4.1, and complied with all other agreements required by this Agreement to be performed or complied with by it on or before the Closing Date.

(b)     No claim, action, suit or proceeding shall be pending or threatened against Parent or Buyer which, if adversely determined, would prevent or hinder the consummation of the transaction and other actions contemplated hereby or result in the payment of substantial damages as a result of such transaction and actions.

(c)     The representations and warranties set forth in Articles 2A and 2B hereof shall be true and correct in all material respects at and as of the Closing Date as though then made, except that any such representation or warranty made as of a specified date (other than the date hereof) shall only need to have been true on and as of such date. Buyer and Parent shall have performed in all material respects all of the covenants and agreements required to be performed and complied with by it under this Agreement prior to the Closing. Buyer and Parent shall have delivered a certificate to Seller to such effect.

The foregoing conditions are solely for the benefit and protection of Seller and Principal and any one or more of them may be waived by Seller and Principal, in whole or in part at their sole option.

9.     Expenses.

9.1     Expenses. The parties acknowledge and agree that the expenses in connection with this transaction shall be borne as follows:

(a)     Each of the parties hereto will bear and pay his or its own expenses incurred in connection with the transaction contemplated herein, whether incurred prior to or after the date hereof, including without limitation all accounting and legal fees.

(b)     Seller shall pay (i) any fees or other charges charged by Seller's creditors or other third parties in connection with the release of any security interests and guaranties granted by Principal to such creditors in connection with such debts.

(c)   Buyer shall pay all transfer, sale or other taxes arising as a result of Seller's transfer of the Assets to Buyer.

9.2   <u>Brokers</u>. Seller and the Principal jointly and severally represent that neither of them have, and Buyer and Parent hereby represent that neither of them has engaged or employed any brokers, finders, or consultants in connection with this Agreement and the transactions herein contained. Seller and Principal shall hold Buyer and Parent, and Buyer and Parent shall hold Principal and Seller, harmless against any and all claims or liabilities asserted by or due to any such person upon the basis of an engagement by any of the Seller or Principal on the one hand, or Buyer or Parent on the other hand.

10.   <u>Closing</u>. The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place on August 1, 2000, at the offices of Maslon Edelman Borman & Brand, LLP, or at such other date and place as may be mutually agreed upon by the parties hereto. The date at which the closing takes place are referred to elsewhere in this Agreement as the "<u>Closing Date</u>."

10.1   <u>Deliveries by Seller and Principal at Closing</u>. At the Closing, Seller and the Principal, as appropriate, will deliver to the Buyer:

(a)   a copy of the resolutions duly adopted by Seller's Board of Directors and by Seller's Stockholders authorizing the execution, delivery and performance of this Agreement by the Seller;

(b)   the Employment Agreement between Buyer and Principal, in substantially the form of the attached **Exhibit 6.1;**

(c)   a Bill of Sale, duly executed by Seller, in the form attached hereto as **Exhibit 10.1(c);**

(d)   a Letter of Investment Intent executed by each of Principal and Lynch, in the form of **Exhibit 10.1(d)** attached hereto;

(e)   the certificate contemplated by **Section 8.1(e);**

(f)   a legal opinion of Seller's counsel in the form attached hereto as **Exhibit 10.1(f);** and

(g)   such other instruments as may reasonably be necessary to complete the transactions contemplated by this Agreement.

Seller and Principal agree that, upon and after the Closing Date, they shall cooperate in good faith to carry out such transfer of Assets and shall execute and deliver such further instruments as may be reasonably necessary to complete such transfer all at the expense of Seller and promptly upon Buyer's request.

10.2   Deliveries by Buyer and Parent at Closing. At the Closing, Buyer or Parent, as appropriate, will deliver to the Seller and Principal, as appropriate, the following:

(a)     the Employment Agreement between Buyer and Principal, duly executed by Buyer and in substantially the form of the attached **Exhibit 6.1**;

(b)     the Assumption Agreement, duly executed by Buyer and in substantially the form of the attached **Exhibit 10.2(b)**;

(c)     the certificate contemplated by **Section 8.2(c)**;

(d)     a legal opinion of Buyer's counsel as to due issuance of the Shares, fully paid and non-assessable;

(e)     the warrant to Lynch in substantially the form of the attached **Exhibit 7**; and

(f)     such other instruments as may reasonably be necessary to complete the transactions contemplated by this Agreement.

11.   Indemnification.

11.1   Generally. Seller and Principal hereby agree, jointly and severally, to defend, indemnify and hold harmless Buyer from, against and in respect of:

(a)     Any and all losses, damages or deficiencies (whether as a result of a direct claim by Buyer against Seller or Principal, a third party claim against Buyer or otherwise) resulting to Buyer from any and all breaches of representations, warranties, covenants or other terms of this Agreement by Seller or Principal made or contained in (i) this Agreement, or (ii) in any certification, list, document, exhibit or schedule delivered to Buyer under or in connection with this Agreement or the transactions contemplated herein;

(b)     All losses, costs, damages, liabilities, obligations and reasonable expenses related to or arising out of the Seller's operation of the Business and Assets sold hereunder, in each case, prior to the Closing; and

(c)     All costs and expenses incident to any and all actions, suits, proceedings, claims, demands, assessments or judgments in respect of paragraph (a) of this **Section 11.1**, regardless of the merit thereof, including Buyer's reasonable legal and accounting fees and expenses (whether incident to the foregoing or to Buyer's enforcement of said rights of defense and indemnity).

11.2   Limitations on Indemnification. The right to indemnification under this **Article 11** to the extent based on any breach of any representation or warranty shall terminate on the second anniversary of the Closing Date, except (a) for any claim based on the untruth or inaccuracy of any representation or warranty made herein or in any statement, certificate or schedule furnished hereunder with an intent to deceive or defraud or with reckless disregard for the truth or accuracy thereof, and (b) for any pending

93517.9

-16-

claim for indemnity hereunder which shall have been made prior to such termination dates, the right to indemnity shall have no limit as to time and such claim shall not terminate until the final determination and satisfaction of such claim. In no event shall Seller and Principal's joint and several liability under this Agreement exceed the aggregate amount of Three Million Dollars ($3,000,000) (the "Indemnification Cap").

11.3    Threshold Amount. No claim for indemnification under this **Article 11** shall be made by Buyer unless and until the aggregate amount of such claims (including attorney's fees and costs) by Buyer shall exceed Thirty Thousand Dollars ($30,000) (the "Threshold Amount"), and in such event, the Buyer shall each be entitled to all amounts including but not limited to the Threshold Amount.

11.4    Procedure. If any action, suit or proceeding shall be commenced against Buyer or any claim, demand or assessment be asserted against Buyer in respect of which Buyer proposes to demand defense and indemnification, Seller and Principal shall be notified to that effect with reasonable promptness and shall have the right, but not the obligation, to assume the entire control of the defense, compromise or settlement thereof, including, at the expense of Seller and Principal, employment of counsel reasonably satisfactory to Buyer, and, in connection therewith, Buyer shall cooperate fully to make available to Seller and Principal all pertinent information under its control. If Seller and Principal do not promptly notify Buyer that Seller or Principal will assume the entire control of such defense, then Seller and Principal shall jointly and severally thereafter reimburse Buyer for all of Buyer's expenses (as described herein) for such defense, as and when they are incurred.

11.5    Indemnification Relating to Cash, Accounts Receivable and Payables. Notwithstanding anything to the contrary contained in this Article 10, Seller and Principal shall be jointly and severally liable to Buyer and Parent for any and all losses, costs, damages, liabilities, obligations and reasonable expenses relating to any breach (regardless of materiality) by Seller of the representations contained in Sections 1.12, 1.18 and 1.24 hereof. Moreover, any loss, cost, damage, liability, obligation and expense incurred by Seller or Parent relating to a breach of Sections 1.12, 1.18 and 1.24 shall not be subject to the Threshold Amount nor the Indemnification Cap.

11.6    Source of Indemnification. The primary, but not the sole, recourse for indemnification claims made by Buyer or Parent under this Agreement shall be the Shares. Any amount owed to Buyer or Parent pursuant to this Article 11 hereunder will be first immediately payable to Buyer or Parent out of the Shares based on a per share value equal to the "Fair Market Value." "Fair Market Value" shall mean the average of the closing prices for Parent Common Stock reported by the principal exchange on which such shares trade, or the last sale prices as reported by the National Association of Securities Dealers, Inc. Automated Quotation National Market or Small-Cap Market, as the case may be, for the ten (10) business days immediately preceding the date of determination or, in the event no public market shall exist for Parent Common Stock at the time of such determination, Fair Market Value shall equal $6.00 per share. To the extent the Shares are insufficient to satisfy any obligation of Seller and Principal under this Article 11, nothing herein shall limit the rights of Buyer and Parent to pursue all other remedies available to them to enforce the indemnification obligations of Seller and Principal. Notwithstanding anything to the contrary contained in this Section 11.6, in the event Buyer or Parent asserts a claim for indemnification pursuant to Section 11.5 hereof, Buyer and Parent shall not be required to first pursue the Shares as the primary source to satisfy such indemnification claims, but rather Buyer or Parent shall

93517.9                                          -17-

be free to pursue any and all remedies against Seller and Principal then available, including without limitation, the right to pursue an action for damages against Seller and/or Principal.

12.    Survival of Representations, Warranties and Covenants. All covenants, representations and warranties herein made shall survive the closing hereunder until the second anniversary of the Closing Date; except claims arising out of **Sections 1.8** and **1.16** shall survive for the duration of any relevant statute of limitations period and other than with respect to claims specifically raised by the aggrieved party or parties in one or more written notices given to the allegedly offending party or parties prior to the first anniversary of the Closing Date, and such claims may continue to be asserted by the aggrieved party or parties after that date.

13.    Other Covenants.

13.1    Liquidation or Transfer of Assumed Name. Promptly after the Closing on the Closing Date, Seller shall assign to Buyer the assumed name "CCNow, Inc." any other names derived therefrom, and shall execute an assignment of any such certificate of assumed name issued to Seller by the Secretary of State of the State of Delaware, and shall promptly cause the dissolution of Seller under the laws of the State of Delaware. Further, Seller agrees to use its best efforts to assist Buyer in obtaining all rights in the name CCNow, Incorporated and any other names derived therefrom.

13.2    Taxes and Fees. Buyer shall be responsible for and shall pay all sales, transfer or similar taxes or governmental charges, if any, and all deed taxes and recording fees with respect to the sale and purchase of the Assets, whether levied against the Assets, Seller or Buyer.

13.3    Set-Off. If Seller or Principal fail to pay any amounts either owes to Buyer or Parent pursuant to this Agreement, Buyer and Parent shall have the right to offset such amounts that have not been paid against all amounts which are owed by Buyer or Parent to Seller or Principal pursuant to any and all obligations whether or not arising under this Agreement.

13.4    Confidential Information. Each party acknowledges that it has, will or may have access to and become informed of Confidential Information which is a competitive asset of the other (whether or not included in the Assets). As used herein, "Confidential Information" shall mean information that is proprietary to Buyer, Seller or the Business or proprietary to others and entrusted to Buyer or Seller, whether or not trade secrets. Confidential Information includes, but is not limited to, information relating to business plans and to business as conducted or anticipated to be conducted by the parties hereto and to their past, current or anticipated business (including without limitation information relating to the Business). Confidential Information also includes, without limitation, customer lists and information concerning purchasing, accounting, marketing, selling, products and services of Seller and Buyer, and shall further include the same aforementioned Confidential Information with respect to the assets purchased by Buyer pursuant to this Agreement. Each party agrees that it will keep all Confidential Information in strict confidence and to never directly or indirectly make known, divulge, reveal, furnish, make available, or use any Confidential Information; provided, that Buyer shall be under no such obligation with respect to Confidential Information relating to the Business or the Assets acquired hereunder.

13.5   Notice of Termination of Seller's Employees. With respect to those employees of Seller who become employees of Buyer upon the Closing (the "Seller Employees"), Buyer covenants and agrees that in the event the employment of any of the Seller Employees' is terminated within the 12-month period following the Closing Date (a) by Buyer by reason of down-sizing or for other reasons unrelated to job performance, or (b) by such employee as a result of relocation to a work site more than 25 miles from such employee's current work site, then Buyer shall either (i) provide 60 days' notice of employment termination to such Seller Employees, or (ii) in the event Buyer provides less than 60 days' notice to such Seller Employees, continue to pay to such Seller Employees their regular compensation for a period of 60 days following notice by Buyer of such termination.

14.   Miscellaneous.

14.1   Parties in Interest. This Agreement shall inure to the benefit of and bind the parties hereto, and their respective heirs, personal representatives, legatees, successors and assigns, as the case may be.

14.2   Headings. The headings of Sections and paragraphs hereunder are for convenience and reference only, and shall not be deemed a part of this Agreement.

14.3   No Waiver. No delay or failure on the part of any party hereto to exercise any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any waiver on the part of any party hereto of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder; nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

14.4   Entire Agreement. This Agreement (which includes the Schedules and Exhibits) sets forth the parties' final and entire agreement with respect to its subject matter and supersedes any and all prior understandings and agreements. This Agreement shall not be modified or amended in any fashion except by an instrument in writing signed by the parties hereto.

14.5   Third Parties. This Agreement is not intended to confer upon any person (other than the parties hereto) any benefits, rights or remedies hereunder.

14.6   Severability. If any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, invalid or unenforceable, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be illegal, invalid or unenforceable, and such illegality, invalidity or unenforceability shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

14.7   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota without regard to principles of conflict of laws. The parties agree that any action, suit, claim or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement shall be brought in either a Minnesota State Court or a federal court sitting in the State of Minnesota. Each party waives any objection which such party may now or hereafter

have to the laying of venue of any such action, suit, claim or proceeding, and irrevocably consents and submits to the jurisdiction of any such court in the State of Minnesota (and the appropriate appellate courts) in any such action, suit, claim or proceeding shall be effective against such party when transmitted in accordance with **Section 14.10** hereof. Nothing contained in this Agreement shall be deemed to affect the right of any party to serve process in an manner permitted by law.

14.8    <u>Injunctive Relief</u>. The parties hereto acknowledge and agree that the other parties would be damages irreparably in the event any of the provisions of this Agreement, including without limitation **Section 13.4**, are not performed substantially in accordance with their specific terms. Accordingly, each of the parties agrees that the other parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the substantial performance of this Agreement and the terms and provisions hereof.

14.9    <u>Negotiations</u>. Until all parties have fully executed this Agreement, this Agreement constitutes nonbinding negotiations between the parties hereto and no rights shall arise hereunder.

14.10    <u>Notices</u>. All notices, instructions and other communications required or permitted to be given hereunder or necessary or convenient in connection herewith must be in writing and will be deemed delivered (i) when personally served or when delivered on a business day by facsimile (facsimile number of the person to whom notice is given), (ii) the first business day following the date of deposit with an overnight courier service or (iii) on the earlier of actual receipt or the third business day following the date on which the notice is deposited in the United States Mail, first class  certified, postage prepaid, return receipt requested, addressed as follows:

        If to the Seller:

                CCNow, Inc.
                4920 Niagra Rd., Suite 206
                College Park, MD  20740
                Attn: Larry McPhillips
                Facsimile: (301) ___-_____

        With copies to (which shall not constitute notice):

                Robert B. Canter, Esquire
                Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
                11921 Rockville Pike
                Rockville, MD 20852
                Facsimile: (301) 230-2891

93517.9

If to the Principal:

        Mr. Larry McPhillips
        *10105 Baltimore Avenue, Apt. #3209*
        *College Park, MD 20740*
        Facsimile: (   ) _____

With copies to (which shall not constitute notice):

        Robert B. Canter, Esquire
        Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
        11921 Rockville Pike
        Rockville, MD 20852
        Facsimile: (301) 230-2891

If to the Buyer:

        Innuity Acquisition Corp.
        1712 Hopkins Crossroad
        Minnetonka, MN 55305
        Attn: President
        Facsimile: (952) 632-1461

With copies to (which shall not constitute notice)

        Maslon Edelman Borman & Brand, LLP
        3300 Norwest Center
        90 South Seventh Street
        Minneapolis, MN 55402
        Attn: Joseph Alexander, Esq.
        Facsimile: (612) 672-8397

If to Parent:

        Innuity, Inc.
        1712 Hopkins Crossroad
        Minnetonka, MN 55305
        Attn: Neil P. Ayotte, Vice President & General Counsel
        Facsimile: (952) 632-1461

With copies to (which shall not constitute notice)

        Maslon Edelman Borman & Brand, LLP
        3300 Norwest Center
        90 South Seventh Street

93517.9

-21-

Minneapolis, MN 55402
Attn: Joseph Alexander, Esq.
Facsimile: (612) 672-8397

14.9   <u>Knowledge Convention</u>.  For purposes of this Agreement, "the best of Seller's or Principal's knowledge," or similar terms, shall include all facts, circumstances, or other information known to Principal or any officer, director, executive or manager of Seller, or any such facts, circumstances or information that such persons should have known upon the exercise if customary diligence.

14.10   <u>Counterparts</u>.  For the convenience of the parties and to facilitate the execution of this Agreement, any number of counterparts hereof may be executed and each such executed counterpart shall be deemed to be an original instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CCNOW, INC. ("Seller")                      INNUITY ACQUISITION CORP. ("Buyer")

By:_____          By:_____
     Larry McPhillips                              Alan Bignall
     Chief Executive Officer                       President

PRINCIPAL:                                   INNUITY, INC. ("Buyer")

_____             By:_____
Larry McPhillips, individually                Alan Bignall
                                             President

93517

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**CCNOW, INC. ("Seller")**                    **INNUITY ACQUISITION CORP. ("Buyer")**

By:                                           By:
    Larry McPhillips                              Alan Bignall
    Chief Executive Officer                       President

**PRINCIPAL:**                                **INNUITY, INC. ("Parent")**

                                              By:
Larry McPhillips, individually                    Alan Bignall
                                                  President

93517