UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 05-398 (JNE)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | GOVERNMENT'S POSITION |
| ) | REGARDING SENTENCING |
| v. ) | |
| ) | |
| LARRY EDWARD MCPHILLIPS, ) | |
| ) | |
| Defendant. ) | |

The United States of America, by and through its attorneys, Rachel K. Paulose, United States Attorney for the District of Minnesota, and Joseph T. Dixon, III, Assistant United States Attorney, hereby submits the Government's Position Regarding Sentencing. The United States respectfully requests the Court impose a sentence within the applicable Guideline as calculated in the PSI: 30-37 months.

I.   SUMMARY

*The Offense*

At his change of plea, the defendant acknowledged that he fraudulently stole funds, by accessing protected corporate computers and creating fictitious transactions that caused corporate funds to be diverted to bank accounts controlled by the defendant.

In particular, the defendant admitted that from March 23, 2002 (the date when Digital River, Inc. acquired the CCNow business from

Innuity, Inc.) until July 1, 2002 (when his activity was discovered), the defendant fraudulently diverted $109,395.70 in corporate funds to his bank accounts.

By the same token, the defendant also admitted initiating the same conduct -- creating fictitious transactions in the CCNow records so as to cause bank transfers to accounts controlled by him -- starting in approximately July 2001 when the CCNow business was owned by Innuity, Inc.  From July 2001 until March 23, 2002, the defendant admitted causing the transfer of $388,397.43 of corporate funds to his accounts without the corporation's knowledge or permission.

At his guilty plea and as part of his plea agreement, the defendant reserved the right to dispute the loss to Innuity, Inc., asserting that he would provide the Court and the government with facts that would legitimize his exercise of "self-help."  Those facts – set forth in Defendant's Position with Respect to Sentencing Factors – fail to establish the legitimacy of his actions either as a matter of law or fact.

*Calculating the Offense Loss Does Not Contemplate Weighing The Entire Defendant-Victim Relationship*

As a matter of law, defendant's claim is premised on his assertion that the loss can only be determined by a review of the "entirety of the business relationship between Innuity and Larry McPhillips."  Def.'s Position at 9.  This assertion is incorrect and unsupported by legal precedent.  While the Court must credit against the loss calculation "the fair market value of the property returned and the services rendered," see Section 2B1.1, app. note 2(E), courts have done so by analyzing the offense in question for benefits obtained by a victim as part of a scheme.  Notably, the defendant does not assert any <u>direct</u> benefit to either victim as a result of his unauthorized creation of fictitious transactions within the CCNow corporate records, but instead looks to the overall value he ascribes to his association with the victims.  Precedent does not support this type of analysis: courts have not scoured entire defendant-victim relationships looking for instances in which the relationship produced some benefit to a victim – an endeavor this defendant now asks this Court to pursue on his behalf.  As such, there is no legal basis to support defendant's contention that the entirety of the relationship must be considered for benefits to credit to the defendant (anymore than the Guideline

analysis would support reviewing the defendant-victim relationship for instances unrelated to the offense that caused additional loss to the victim).

*Defendant's Claims Regarding Misrepresentations Are Not Supported by the Acquisition Agreement*

Defendant's contention that he is a "victim of deceptive practices by Innuity" are simply not supported by his submission. Citing the Acquisition Agreement, the defendant contends that Innuity made representations and promises in the course of purchasing his CCNow business that were highly suspect and ultimately unfulfilled. This claim is not borne out by the Acquisition Agreement. In his affidavit, the defendant outlines a series of business plans and initiatives, discussed as part of the Innuity acquisition of the CCNow business, that ultimately went unfulfilled. Def.'s Aff. at 8-27. Yet, the Acquisition Agreement, which constituted the entire and final agreement and superseded all prior understandings, see Def.'s Ex. 3, Section 14.4, did not include any of these promises regarding the future operations of the acquired CCNow business. See id. Sections 2A & 2B (Warranties and Representations of the Buyer/Parent); Section 13 (Other Covenants). Indeed, although the defendant decries the downsizing of his company, the agreement contemplated that CCNow

employees would be terminated and would receive 60 days severance. Id., Section 13.5.

Moreover, with respect to the $537,300 that the defendant claims was owed to him by Innuity, see Def.'s Aff. at 40, and is relied on by him to justify his actions, none relates to his claims of unfulfilled promises or initiatives. This purported debt is comprised of two components: (1) salary purportedly due to the defendant under his Employment Agreement, and (2) Series C securities debt owned by the defendant. As with his other claims, these claims are also unsupported by the defendant's own submission.

*Defendant's Conduct Belies His Claim Under His Employment Agreement*

There is no dispute that the defendant quit his employment with Innuity, and was not terminated. In his affidavit, defendant argues that Innuity's decision to layoff CCNow employees, effectively provided him with "Good Reason" under the terms of the Employment Agreement, see Def.'s Ex. 4, resulting in an immediate debt to him of $387,500 under the terms of that agreement. Def.'s Aff. at 32. Yet, the defendant's own actions simply do not support the claim he now makes in an effort to reduce his guideline and restitution obligation.

When the defendant resigned his position on February 5, 2001 he noted "I have the highest respect and admiration for Innuity and its management, and I certainly bear no ill will toward the company. However, during the last several weeks I have come to realize that certain factors make it difficult for me to be productive within the company structure." Def.'s Ex. 8. Missing from his resignation letter was any mention of "Good Cause" or breach of contract. Far from asserting that Innuity owed him anything under the terms of the agreement, the defendant finished his Notice of Resignation by stating "In a good-faith attempt to ensure the successful continuation of the CCNow product, I can be available after the 2/16 termination date on a consulting basis in case additional transition work is necessary." Id.

Nor did defendant's conduct following his resignation suggest he believed at the time he was owed nearly $400,000. Shortly after his resignation, the defendant began working for Innuity on a consultant basis for $85.00 per hour. Def.'s Aff. at 32-36. On two separate occasions in October 2001 and December 18, 2001, the defendant invested moneys owed to him for his consulting services, totaling $35,000, in the company. Def.'s Aff. at 39. In one instance, in January 2002, the defendant even provided Innuity with $50,000 in cash to purchase additional Series C debt instruments.

Id. Although he discussed the conversion of $35,000 in Innuity debt to him to Series C shares in his transmittal letter, the defendant made no mention of what would have appeared to have been the fairly large elephant ($387,500) that he now claims was in the room at the time. Def.'s Ex. 10. Given the defendant's own conduct, the facts do not establish that his resignation was for "Good Reason" or that he even believed he was owed $387,500 under the terms of his Employment Agreement.

*Defendant's Status As Security Holder Did Not Entitle Him to "Special Distributions"*

Defendant also justifies his actions by pointing to his holdings of Innuity Series C debt securities that went unpaid. Def.'s Aff. at 40. Notably, the defendant began his scheme in July 2001, before he had invested in Series C securities. According to the defendant, he invested in these new Innuity debt securities after his resignation from the company because they had misled him; after the company had "squashed down" its existing shareholders; and after the company had a purportedly long history of failing to pay the defendant for his consulting services. Obviously, the defendant deemed these high risk investment instruments worthy. Nor was he alone. According to the defendant, Innuity generated interest among other investors; these other investors, along with

the defendant, constituted a shareholder class. Def.'s Aff. at 39-40. Yet, as he was investing in Innuity securities, along with others, the defendant was also making bi-monthly "special distributions" to himself. Notably, according to a submission to the probation officer dated May 5, 2006, the defendant acknowledged a recent distribution of shares to him as a member of this shareholder class, which will likely have a substantial value. Thus, while the defendant has received some benefits of his Series C shares, his fellow class members have not received the "special distributions" that the defendant made to himself. To the contrary, these fellow investors were deprived of the $387,500 that the defendant stole from the Innuity accounts as a source of assets to repay them their investment.

*   *   *

In many respects, the defendant's story of a disappointing investment was not an uncommon one in the era of the dot.com bust. Defendant's financial advisor was properly wary of all stock deals. Yet, the defendant – like many others during the dot.com boom – went ahead investing his entire company in Innuity stock, hoping that dot.com stocks would continue on their upward surge. That investment decision turned out to be a poor one. More importantly,

the ultimate results of that risky investment can in no way justify or legitimize the defendant's fraud.

II. GUIDELINE ANALYSIS

A. AMOUNT OF LOSS CALCULATION

Pursuant to U.S.S.G. § 2B1.1 app. note 2(A)(iv), a defendant is liable for all "reasonably foreseeable pecuniary harm." At sentencing, the government must establish loss by a preponderance of the evidence. <u>United States v. Hammer</u>, 3 F.3d 266, 272 (8th Cir. 1993).

The PSI correctly calculates the loss amount as $497,793.13. In this case, defendant acknowledges a loss of $109,395.70 based on his fraudulent diversion of funds from Digital River, Inc. In addition, the defendant also acknowledged using the same scheme (adding fictitious transactions to corporate accounts) to divert $388,397.43 from Innuity funds without its knowledge or permission.

Citing the "Credit Against Loss" provision set forth in 2B1.1 app note. 2(E), defendant incorrectly contends that the $388,397.43 in Innuity funds should not be counted as a loss, based on an assertion that the "entirety" of the relationship between Innuity and the defendants was a net gain to the victim. This assertion is incorrect. Both by its terms, as well as its application, the instances in which a defendant receives a credit against loss under

the application note is where there is a nexus between the value provided by the defendant and the victim.  In each of the cases relied upon by the defendant the credit was related to the offense at issue.

In this case, the defendant received value for his company and his services, namely the Innuity securities he voluntarily agreed to accept.  The fact that these securities were ultimately less valuable than the defendant hoped does not mean he was not compensated.  Moreover, there is no contention that the defendant's offense conduct, namely adding fictitious transactions to corporate records, resulted in a benefit to the business.

Ultimately, defendant's contention that this Court should sit as the ultimate arbiter of (1) civil claims never brought by the defendant and (2) the net benefit or loss of the entire relationship between the defendant and his victims is neither supported by the Guidelines, case law or the facts asserted by the defendant.

B. SOPHISTICATED MEANS

The PSI also correctly applies a 2-level enhancement for sophisticated means. Guideline Section 2B1.1(b)(8)(C) provides for a two-point enhancement if the offense committed by a defendant involves sophisticated means.

In this case, the defendant executed his scheme by accessing a protected corporate computer over the internet, without authorization, and utilizing hidden files in the CCNow computer directory. PSI ¶ 11.  Once he connected to the corporate servers, the defendant created fictitious transactions in different dollar amounts utilizing fictitious merchants in order to divert corporate funds to accounts controlled by the defendant. PSI ¶ 8-10.  He repeated his activities bi-monthly over one year until his fraud was detected by Digital River.  PSI ¶ 8-10.

Moreover, (1) prior to commencing his scheme, the defendant registered two business names, (2) immediately prior to the commencement of the scheme in July 2001 the defendant opened bank accounts in the names of these businesses; (3) the corporate funds were diverted by the defendant to the business accounts he controlled; and (4) the defendant thereafter transferred funds from these accounts to his personal accounts.[1]

Application Note 6(B) to Section 2B1.1 of the Sentencing Guidelines defines "sophisticated means" as involving "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  Such circumstances may

---

[1] Absent a stipulation, the government will seek to adduce evidence of these facts at a sentencing hearing.

exist "even if each step in the scheme was not elaborate", so long as the "the total scheme was sophisticated." United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003). The application notes provide that "hiding assets or transactions, or both through use of fictitious entities" or "corporate shells," are hallmarks of sophisticated means. App. Note 6(B).

In this case, the defendant utilized hidden computer files to access the protected computer, created fictitious transactions and fake merchants to effect the fraudulent diversion of corporate funds and used business accounts in an attempt to further protect his identity as the ultimate receiver of the funds. He did so numerous times, twice a month, month after month, for approximately one year. Accordingly, the sophisticated means enhancement is more than warranted. See United States v. Harvey, 413 F.3d 850, 853 (8th Cir. 2005) (affirming application of sophisticated means where offense, which involved repeatedly creating fictitious documents using a computer, required extensive planning and attention to detail); United States v. Kontny, 238 F.3d 815, 820 (7th Cir. 2001) (affirming application of sophisticated means where defendant programmed a business computer to treat overtime wages as expenses to avoid tax liabilities).

C.   DOWNWARD DEPARTURE

Defendant relies on Section 5K2.10, Victim Conduct, as a basis for a downward departure. The claim is neither supported by law nor fact.

By its terms, Section 5K2.10 is principally aimed at those who have committed violent offenses. That said, the provision acknowledges that it might be relevant in unusual cases where "substantial" victim misconduct over an "extended course of provocation and harassment" lead a defendant to steal or destroy property. In applying this provision in the context of non-violent offenses, courts have focused on whether a victim incited the offense and the immediacy of the provocation. See United States v. Mussayek, 338 F.3d 245, 255-58 (3rd Cir. 2003) (affirming denial of downward departure in case of extortion conspiracy where the victim had defrauded the defendant.)

The defendant's theft commenced months after his resignation from Innuity, a company for whom the defendant expressed his "highest respect and admiration". Notably, his theft began months later in July 2001, the same time that key investors were enticed to lend Innuity working capital to address the company's cash crisis (a crisis made worse by the defendant's offense). Furthermore, the fact that the defendant continued his theft

13

against Digital River, a second company that the defendant acknowledges to have had "clean hands," leaves little doubt that the defendant's crime was simply driven by greed and not provocation. Accordingly, a departure is not warranted.

II. STATUTORY FACTORS

The sentence requested by the government is also consistent with the statutory goals of sentencing. The considerations for the Court in imposing a sentence, as set forth in 18 U.S.C. § 3553(a), include "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." Giving appropriate due deference to the Guidelines, there is simply no basis to deviate from the applicable range.

III. RESTITUTION

The government has the burden of proving the amount of restitution by a preponderance of the evidence. United States v. Young, 272 F.3d 1052, 1056 (8th Cir. 2001). The burden of proving an offset against restitution lies with the defendant. United States v. Ruff, 420 F.3d 772, 775-76 (8th Cir. 2005).

Under the Mandatory Victims Restitution Act, this Court is required to order full restitution to identifiable victims in the amount of the property lost as a result of the offense less the value of any part of the property that is returned. 18 U.S.C. § 3663A(b)(1)(B). Those amounts are accurately set forth in the PSI. The defendant asserts that Innuity cannot be classified as a "victim." Def.'s Position at 17. For the reasons set forth above, this assertion is not supported by his submission. Moreover, "victim" is defined as a "person directly or proximately harmed as a result of the commission of an offense . . . " 18 U.S.C. § 3663A(a)(2). Notably, there is no carve-out even for those victims who have provoked an offense.

The defendant has correctly noted that Digital River has $200,000 in an escrow account against which it has made a claim vis-a-vis Innuity based on the defendant's conduct. As of this date, that claim has not been resolved. To the extent that Digital

15

River recovers in the future from a third party, namely Innuity (or its successors), the amount of restitution with regard to Digital River will be decreased in that amount and the restitution shall be paid to the compensating third party.  18 U.S.C. § 3664(j).

CONCLUSION

For the foregoing reasons, the government respectfully requests the Court impose a sentence within the applicable Guideline as calculated in the PSI, 30-37 months, as well as impose mandatory restitution to both victims.

Dated: May 11, 2006                     Respectfully submitted,

                                        RACHEL K. PAULOSE
                                        United States Attorney


                                        s/ Joseph Dixon

                                        BY:  JOSEPH T. DIXON, III
                                        Assistant U.S. Attorney
                                        Attorney ID No. 0283903